## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ASSOCIATION OF INDEPENDENT PHARMACEUTICAL WHOLESALERS, INC., 84 Bloomfield Avenue Pine Brook, NJ 07058 | |
| Plaintiff, | |
| v. | Civil Action No.:  1:16-cv-2214 |
| OPTUMRX, INC., 17900 Von Karman Suite #125 Irvine, CA 92614; | |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, 200 Independence Avenue, S.W. Washington, DC 20201 | |
| and | |
| SYLVIA MATHEWS BURWELL, Secretary, 200 Independence Avenue, S.W. Washington, DC 20201; | |
| CENTERS FOR MEDICARE AND MEDICAID SERVICES, 7500 Security Boulevard Baltimore, MD 21244 | |
| and | |
| ANDREW M. SLAVITT, Acting Administrator, 7500 Security Boulevard Baltimore, MD 21244; | |
| Defendants. | |

## COMPLAINT

Plaintiff, the Association of Independent Pharmaceutical Wholesalers, Inc. ("AIPW" or

"Plaintiff"), by and through their attorneys, **FRIER & LEVITT, LLC**, and by way of Complaint

against Defendants, OptumRx, Inc. ("OptumRx"); Sylvia Mathews Burwell ("Burwell"), solely in her official capacity as Secretary of the United States Department of Health and Human Services; the United States Department of Health and Human Services ("HHS"), Andrew M. Slavitt ("Slavitt"), solely in his capacity as Acting Administrator of the Centers for Medicare and Medicaid Services; and the Centers for Medicare and Medicaid Services ("CMS"), do allege as follows:

## PRELIMINARY STATEMENT

1.     Plaintiff brings this Complaint in response to OptumRx and the United States Government's implementation of a policy requiring all of its participating network pharmacies to purchase medications only from a Verified-Accredited-Wholesale Distributor ("VAWD"). VAWD, however, is not sanctioned by HHS nor by its "sub-agencies" such as CMS and the FDA, and its licensure is not a requirement imposed upon wholesale distributors by Federal law. As detailed below, this policy will not only drive Plaintiff and their Members out of business, but will irreparably damage the United States' prescription drug delivery system. As a result, OptumRx and, by extension, the United States Government's VAWD-accreditation policy should be deemed violative of numerous State and Federal laws and struck down by this Honorable Court.

2.     Plaintiff was originally organized as a for-profit corporation created on November 2, 2016 and subsequently dissolved on January 16, 2017.   A separate not-for-profit entity called Association of Independent Pharmaceutical Wholesalers, Inc.[1], created on February 7, 2017, assumed all assets and liabilities of the Plaintiff, including the interest in the instant litigation and continues this litigation as the transferee of interest.   Both transferor and transferee were incorporated to represent and protect the interests of independently-owned, duly-licensed wholesalers and/or distributors that engage in the lawful sourcing and distribution of authentic

---

[1] Attached to this First Amended Complaint as **Exhibit A is** a document identifying all twenty-two (22) current members of the not-for-profit entity Association of Independent Pharmaceutical Wholesalers, Inc., as of February 17, 2017.  All twenty-two (22) entities listed in Exhibit A also had an interest in the Association of Independent Pharmaceutical Wholesalers, Inc. entity created on November 2, 2016 and subsequently dissolved on January 16, 2017.

medications and medical supplies to a number of purchasers (such as licensed pharmacies, durable medical equipment companies, physicians, hospitals, and other wholesalers) throughout the United States. Hereinafter, the entities are simply referred to as "Plaintiff" or "AIPW".

3.   Plaintiff is bringing this litigation on behalf of its members, who all would have standing to sue in this litigation.

4.   The interests and issues implicated in this litigation fit squarely within AIPW's purpose as a trade association for independent wholesalers of prescription drug products.

5.   This litigation will not be adversely affected by the absence of the individual members of AIPW as named parties in this litigation.

6.   Plaintiff's members, along with similarly situated independent wholesalers, are part of the "Secondary Wholesale Market."

7.   The Secondary Wholesale Market is comprised of smaller wholesalers that purchase the bulk of their medications and/or supplies from duly-licensed pharmacies and/or other duly-licensed wholesalers, and then sell the medications and/or supplies to other pharmacies.

8.   At all times Plaintiff's members' participation in the Secondary Wholesale Market is wholly compliant with all applicable Federal and State laws.

9.   The wholesale drug market is comprised predominately of three large players—AmerisourceBergen Corporation, Cardinal Health, Inc., and McKesson Corporation (collectively referred to hereinafter as "the Big Three"). About 85% of all revenues in the drug wholesale market are generated by the Big Three.

10.     The Big Three do not participate in the Secondary Wholesale Market (at least directly[2]), but rather obtain their medications and/or supplies primarily from drug or device manufacturers.

11.     OptumRx is a Pharmacy Benefit Manager ("PBM"). Like other PBMs, OptumRx is essentially a third-party contractor tasked with administering the prescription drug benefit plans of insurance carriers and Medicare Part D plan sponsors. Plan sponsors are entities that provide Medicare Part D prescription drug plans and Medicare Advantage prescription drug plans. 42 C.F.R. § 423.4.

12.     OptumRx manages prescription drug benefit plans for not only private insurance companies and large employers, but also the State and Federal Government through the Medicare and Medicaid programs. *See generally* 42 U.S.C. §§ 1395w-101, *et seq.* and 42 U.S.C. §§ 1396, *et seq.*

13.     OptumRx contracts with a network of retail, mail order and specialty pharmacies to provide and dispense covered prescription services to OptumRx's members.  OptumRx regulates the participating pharmacies' behavior and performance in the network through various contractual documents, including a Pharmacy Network Agreement, a Provider Manual, and numerous informal provider communications and Network Updates.  Participating pharmacies must accept these terms and conditions to participate in OptumRx's networks, otherwise they would not be entitled to receive reimbursement for prescriptions dispensed to OptumRx's patients.

14.     As detailed below, a series of partnerships and agreements throughout the insurance/PBM/wholesale industry has resulted in OptumRx aligning its interests with the Big Three.

---

[2] Each of the Big Three own or have interests in or affiliations with subsidiary wholesale distributors who may have different business practices.

15.     OptumRx's business relationships with the Big Three have resulted in the implementation of bad faith policies designed to steer market share away from the Secondary Wholesale Market and toward the Big Three.

16.     More specifically, by way of letter dated August 11, 2016, OptumRx informed its participating pharmacies that effective October 1, 2016, participating pharmacies were required to purchase all medications being dispensed to OptumRx members from a Verified-Accredited-Wholesale Distributor ("VAWD") (referred to hereafter as "VAWD-Accreditation Policy").

17.     VAWD is an accreditation offered by the National Association Boards of Pharmacy ("NABP"). Most notably, entities seeking VAWD accreditation must not "engage in the wholesale distribution of Prescription drugs that are purchased or received from pharmacies or practitioners, or from wholesale distributors that obtained them from pharmacies or practitioners" even though this practice is allowable under state and federal regulations of drug wholesalers.  This eliminates the Secondary Wholesale Market.

18.     As a result, Plaintiff's members and other similarly situated secondary wholesalers' business models, which entail the purchasing of prescription drugs from pharmacies and practitioners, renders compliance with VAWD's conditions for accreditation an impossibility.

19.     Plaintiff's members have already been informed by their pharmacy customers that the pharmacies will cease ordering medications and supplies from Plaintiff's members due to OptumRx's VAWD-Accreditation Policy.  This is because the pharmacy customers face PBM audits from OptumRx, whereby OptumRx actively threatens to "recoup" 100% of funds paid to the pharmacy arising from the purchase of drugs from wholesalers such as Plaintiff's members that are not VAWD accredited.

20.     Additionally, OptumRx is a "First Tier" entity with delegated authority from a "PDP Sponsor," who must "comply with all applicable Federal laws, regulations, and CMS

instructions." 42 C.F.R. § 423.505.   Beyond being simply bound by all applicable Federal laws, regulations, and CMS instructions, OptumRx is an agent of the Federal Government in their administration of Medicare Part D.

21.     As a result, an informal rule making by HHS or CMS is required for the VAWD-Accreditation Policy established by OptumRx to be effective as against "Downstream Entities"—such as Plaintiff's members and their customers—who "furnish" Medicare "services or benefits" to Medicare enrollees.

22.     HHS, Burwell, CMS, and Slavitt (collectively "HHS Defendants") however, have adopted the VAWD-Accreditation Policy without notice and comment rulemaking by way of their agent, OptumRx's implementation of the VAWD-Accreditation policy.

23.     For the reasons that follow, OptumRx's VAWD-Accreditation Policy is a blatant violation of the California Unfair Practices Act as well as numerous other state law causes of action. Additionally, the implementation of the VAWD-Accreditation Policy without proper notice and comment rulemaking is a violation of the Administrative Procedure Act, 5. U.S.C. § 553, *et seq.*

## THE PARTIES

24.     The Association of Independent Pharmaceutical Wholesalers, Inc. is a New Jersey Corporation with its principal place of business located at 84 Bloomfield Avenue, Pine Brook New Jersey 07058.

25.     Upon information and belief, OptumRx is a corporation duly organized and existing under the laws of the State of California with its principal place of business at 17900 Von Karman, Suite #125, Irvine, California 92614.

26.     Defendant Burwell is sued solely in her official capacity as Director of HHS.

27.     Defendant HHS is a cabinet department charged with administration of the Medicare program.

28.     Defendant Slavitt is sued solely in his official capacity as Acting Administrator of CMS.

29.     Defendant CMS is the agency within HHS charged with the administration of the Medicare program.

## JURISDICTION AND VENUE

30.     This Court has subject matter jurisdiction over the claims presented in this action pursuant to 28 U.S.C. § 1331, the Administrative Procedure Act, 5 U.S.C. §§ 701-706, *et seq.*, and the Declaratory Judgment Act, 28 U.S.C §§ 2201 and 2202.

31.     The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over OptumRx's violations of the California Unfair Competition Law and State law claims because these violations arise out of a common nucleus of operative fact and arise out of the same case or controversy.

32.     Additionally, the Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. 1331. There is diversity of citizenship among the parties and the matter in controversy exceeds the sum or value of $75,000.

33.     This Court has personal jurisdiction over Defendants because Defendants transact business within the District of Columbia, provide or assists in providing health benefits to individuals residing within the District of Columbia, committed the acts and omissions giving rise to this lawsuit principally within the District of Columbia, and/or reside in the District of Columbia.

34.     Venue is proper in this District pursuant to 28 U.S.C. 1391(e).

## FACTS COMMON TO ALL COUNTS

### I.  The Prescription Drug Benefit Industry "Ecosystem"

#### A.  *Synopsis of the Drug Distribution Chain*

35.  A typical drug distribution chain has three elements: (1) a manufacturer, which creates and sells a prescription drug to (2) a wholesale distributor, which then sells the drug to (3) a hospital or pharmacy, which dispenses it to patients.

36.  Under Federal law, distributors have the authority to purchase drugs from manufacturers and deliver them to pharmacies, hospitals, and other parties that are not patients. *See, e.g.,* 21 U.S.C. § 353(e)(3)(B) (providing that the wholesale distribution of drugs is defined as the "distribution of drugs…to other than the consumer or patient.").

37.  Wholesale distributors that predominantly buy prescription medicines from the manufacturers and predominantly distribute them directly to health care providers such as hospitals and pharmacies are called "primary" distributors.

38.  Most manufacturers do not sell directly to pharmacies.  Instead, pharmacies purchase their drug inventory from wholesaler distributors, particularly large "primary distributors."

39.  The wholesale distributor market is dominated by three major "primary" distributors in AmerisourceBergen Corporation ("AmerisourceBergen"), Cardinal Health, Inc. ("Cardinal") and McKesson Corporation ("McKesson").  Collectively these major corporations are often referred to as "the Big Three" and collectively maintain approximately an 85% market share of the United States drug wholesale marketplace.

40.  In addition to the Big Three, there are additional, large wholesaler distributors such as Morris & Dickson, H.D. Smith, Smith Drug, Anda Distribution and several cooperative wholesaler groups.  Collectively these additional wholesalers can be referred to as "Other Large Wholesalers."

41.     In addition to the Big Three and Other Large Wholesalers, the wholesale distribution market also includes smaller wholesalers, such as Plaintiff's members, that help service smaller pharmacies that are unable to meet minimum purchasing requirements of the Big Three.

42.     These smaller wholesalers help independent, community pharmacies manage expensive inventory by creating a competitive and legal secondary marketplace for drugs that are at risk of failing to be utilized within the effective date of the medication, thereby diminishing waste. These wholesalers are referred to hereinafter as "Secondary Wholesalers."

43.     As part of the business model of some of these Secondary Wholesalers, they purchase inventory from pharmacies where drug inventory may go unutilized and sell to other pharmacies at lower acquisition costs.  Secondary Wholesalers may also purchase inventory from other wholesalers that had previously purchased the inventory from a pharmacy.

44.     This important market task minimizes drug waste, allows for more efficient acquisition prices and ultimately helps keep healthcare costs down.

45.     Speaking on the importance of the existence Secondary Wholesalers to the prescription drug market, HHS and the FDA reported to Congress that "the secondary wholesale market operates on an arbitrage system whereby secondary distributors, by purchasing and selling drugs at discounts offered by manufacturers and other distributors, help to keep drug prices lower overall for consumers than they would otherwise be without the presence of secondary distributors." *See* United States Department of Health and Human Services ("HHS") and the United States Food and Drug Administration ("FDA"), *The Prescription Drug Marketing Act: Report to Congress*, at 15 (June 2001), *available at* http://www.fda.gov/downloads/RegulatoryInformation/Legislation/SignificantAmendmentstothe FDCAct/PrescriptionDrugMarketingActof1987/UCM203186.pdf.

46.     Most importantly, this market task is completely legal and is supported directly by both the Federal Food, Drug and Cosmetic Act, and by the various State laws relating to licensed wholesale distribution.

**B. Members of AIPW's Role in the Industry**

47.     Plaintiff's members at all times are compliant with State and Federal regulations as they apply to wholesalers and the transfer of prescription medication and supplies.

48.     Plaintiff's members are Secondary Wholesalers which lawfully obtain access to drugs from the Big Three, Other Large Wholesalers, manufacturers, or other lawful sources including smaller wholesalers that may not have VAWD accreditation, as well as providers, such as pharmacies and other practitioners.

49.     Secondary Wholesalers, such as Plaintiff's members and those similarly situated, play an important role for patients and pharmacies by serving as an alternative source of supply to pharmacies who may use the Big Three or Other Large Wholesalers for their usual and anticipated day-to-day operations.

50.     Crucially, Plaintiff's members and similarly situated Secondary Wholesalers provide necessary competition for the Big Three or Other Large Wholesalers, which in turn keeps healthcare costs down especially where the Big three control approximately 85% (or more) of the revenues generated in the wholesale drug market.

51.     Moreover, while most providers (especially pharmacies) rely on the Big Three or Other Large Wholesalers to meet the majority of their drug supply needs, they typically also need to have at least one or more smaller wholesaler in the event that the larger wholesaler cannot meet their demand at any particular time, offer pricing that is below reimbursement, or will not sell to a smaller pharmacy.

52.     Additionally, the Big Three and Other Large Wholesalers typically have steep minimum purchasing requirements that many small, independent pharmacies and other providers cannot possibly meet.

53.     The availability of a secondary market and Secondary Wholesalers is critical to the viability of these providers and their elimination from the marketplace could lead to significant interruptions in patient care and access to sometimes life-saving medications.

54.     In a similar vein, most drug manufacturers limit the number of "authorized distributors of record" to only those entities which are large enough, such as the "Big Three," to purchase their products in massive, bulk amounts.

55.     Due to the comparatively modest nature of many Secondary Wholesalers such as Plaintiff's members, these Secondary Wholesalers cannot reasonably rely on purchasing directly from manufacturers as most manufacturers will refuse to do business with these smaller distributors who are unable to meet certain unrealistic purchasing requirements.

## II.     Regulation of Wholesalers

56.     All wholesale distributors are regulated by a myriad of Federal and State laws and regulations that govern the licensing and conduct of wholesale distributors.

57.     These laws are designed to ensure legal safeguards for prescription drug distribution and protect the market from the sale of counterfeit, adulterated, misbranded, subpotent, and expired prescription drugs.

58.     For example, the Prescription Drug Marketing Act of 1987 (PDMA) amended by the Prescription Drug Amendments of 1992 (PDA), sets the baseline for wholesale distribution regulations and requires among other things, that every wholesale distributor who engages in

wholesale distributions of prescription drugs in interstate commerce must be licensed by the State licensing authority before engaging in wholesale distributions of prescription drugs in interstate commerce and that certain wholesalers provide a statement (also known as a pedigree) prior to each wholesale distribution of prescription drugs and expressly prohibits a wholesale distributor's purchase form a hospital entity, but makes not similar prohibition from a pharmacy or physician.

59.     Further provisions of the PDMA include setting minimum qualifications and specifications of wholesale distributors' personal, codifying minimum requirements for the storage and handling of prescription drugs and establishing violations and penalties for wholesalers who fail to meet such requirements.

60.     Additional Federal action regarding the drug supply chain was taken in 2013 when Congress passed the Drug Quality and Security Act (DQSA), which amended the Federal Food Drug, and Cosmetic Act (FDCA) and outlined new requirements to develop and enhance drug supply chain security by 2023.

61.     Specifically, the DQSA included the Drug Supply Chain Security Act (DSCSA), commonly referred to as "Track-and-Trace," which set forth specific enhancements applicable actors within the overall drug supply chain.   These enhancements include product tracing requirements that went into effect in 2015 for manufacturers, repackagers, wholesale distributors and dispensers, and establish national licensure standards for wholesale distributors and third-party logistics providers.

62.     Importantly, the DSCSA states that no State may establish or continue any standards, requirements or regulations with respect to prescription drug distributor or third-party logistics provider licenses that are inconsistent with, less stringent than, directly related to or covered by the standards and requirements of the DSCSA.

63.     This language indicates that the DSCSA creates a national uniform drug supply chain policy.

64.     Similarly, States, like California, have adopted provisions and regulations aimed at licensing and regulating wholesale distributors and third-party logistics providers.

65.     Pursuant to California law, wholesaler distributors may not sell to "unauthorized persons," cannot acquire dangerous drugs or devices that entity cannot maintain in a secure manner at the licensed premises, and cannot trade, sell, transfer dangerous drugs, known, or reasonably should have known, to be adulterated, misbranded, outdated.

66.     Further, California law requires wholesaler distributors to inspect drugs upon receipt or before shipment, to only buy from authorized and sell to authorized entities, and to quarantine outdated, damaged or misbranded drugs.

67.     Notably, California includes pharmacies within the definition of authorized entities. Thus, under California law, Plaintiff's members' business models, which entail the purchasing of drugs and supplies from pharmacies, are wholly compliant.

68.     The laws and regulations described above have protected and ensured the adequacy of the drug supply chain over the past three decades and private implementation of draconian restrictions such as VAWD do not protect the drug supply chain but rather protect private business interests.

## III.    The Pharmacy Benefit Manager Industry

### A.  Consolidation of the Pharmacy Benefit Manager Industry

69.     OptumRx is a Pharmacy Benefit Manager ("PBM"). PBMs are major players in the delivery of health care in the United States. They act as middlemen in the lucrative business of providing prescription drugs.

70.     They serve as intermediaries between pharmaceutical manufacturers and pharmacies on the one hand (the "supply" side of the trade) and health benefit providers (e.g. insurers, self-insured entities, health maintenance organizations, and public and private health plans) on the other (the "demand" side).

71.     The services that PBMs extend are designed to facilitate the provision of prescription drug benefits to the people who utilize the services of the health benefit providers.

72.     The PBM industry has underwent drastic changes over the past five years. Approximately 75% of the PBM marketplace (or 75% of the covered lives in the United States of America) is comprised of four PBMs: (1) Express Scripts, (2) CVS/Caremark, (3) OptumRx, and (4) Prime Therapeutics.

73.     While there are other, smaller PBMs who administer some plans, the vast majority of lives are managed by these four, extremely large PBMs.

74.     The lack of diversity or competition in the market place stems in large part from the series of mergers, integrations and consolidations that have occurred in recent years in the PBM space.

75.     This PBM market consolidation is well-illustrated in Figure 1.

**Figure 1.**



As a result, upon information and belief, in some areas a single PBM can represent over 80% of the market share.

76.     In addition to consolidation among PBMs, over the past few years there has also been integration between insurance companies and PBMs.

77.     UnitedHealth Group, Inc., the parent company of the nation's largest insurance company in United HealthCare Services, Inc., had originally utilized Medco Health Solutions to administer its prescription drug benefit plans. However, in 2012 UnitedHealth Group, Inc. began migrating the administration of its plans from Medco Health Solutions to OptumRx, United's wholly owned PBM.

78.     Thereafter, in July 2015, Catamaran, one of the nation's largest PBMs, was acquired by UnitedHealth Group, Inc.  As a result, Catamaran and OptumRx have integrated operations and operate under one name, OptumRx.

79.     As a result of these acquisitions, UnitedHealth Group, Inc., with its combined subsidiary in OptumRx-Catamaran, is one of the largest companies in the world holding about 20% market share in the PBM marketplace and has over 66 million members or "covered lives" in 2016.

80.     For the purposes of Medicare, UnitedHealth Group, Inc. operates businesses, including United HealthCare Services, Inc. and OptumRx, which serve as Part D plan sponsors as well as Part D "first tier entities" who work in vertical concert to administer prescription drug benefits.

81.     Pharmacies can service a variety of patients, but the patient benefits are paid predominantly by one of four national PBMs. As such, these four PBMs are the only "Payors" of pharmacy benefits and are essentially the pharmacy's customers. Thus, when a pharmacy loses a contract with a PBM, it is tantamount of the pharmacy losing one of its only four customers/payors.

82.     PBMs dictate the terms of participation through Pharmacy Network Agreements and Provider Manuals, and set forth the manner in which participating providers can carry out pharmacy performance.

83.     Therefore, a pharmacy that is unwilling to abide by OptumRx's VAWD-Accreditation Policy would be forced to discontinue servicing OptumRx's beneficiaries, and would as a result lose approximately one-quarter of its patient base.

84.     In addition, because OptumRx will recoup 100% of all paid claims (including the full acquisition costs of the drugs) submitted from non-VAWD accredited wholesalers from pharmacies, OptumRx makes is practically impossible for any of its in-network pharmacies to purchase from non-VAWD wholesalers as being able to prove which of the pharmacies' drug products came from which supplier will also be virtually impossible.  As a result, the VAWD accreditation requirement necessarily removes the capability of OptumRx's in-network pharmacies to purchase from *any* non-VAWD wholesaler, even if it is only for the purposes of servicing non-OptumRx members.

**B. OptumRx Has Close Relationship with Large Wholesalers**

85.     About 85% of all revenues in the drug wholesale market are generated by three national distributors: AmerisourceBergen, Cardinal Health, and McKesson.

86.     On or about September 1, 2013, AmerisourceBergen and Walgreens and Alliance Boots ("WBA") effectuated a 10-year pharmaceutical distribution agreement wherein WBA was originally granted the right to purchase 7% of AmerisourceBergen's outstanding equity, with additional equity warrants exercisable for an additional ~16% of AmerisourceBergen's outstanding equity.

87.     On or about August 25, 2016, WBA announced that it had agreed with AmerisourceBergen to amend the second tranche of warrants held by WBA to allow WBA to purchase AmerisourceBergen common stock.

88.     As of the date of this Complaint, WBA now beneficially owns approximately 23.9% of AmerisourceBergen's outstanding equity.

89.     Additionally, WBA and Rite Aid Corporation proposed a merger in October 2015. The merger is currently pending approval from the United States Federal Trade Commission.

90.     WBA's market share of 2015 prescription revenues through their "Chain Drugstore Pharmacies" was 14.9% or $54.4 billion. Rite Aid's market share of 2015 prescription drug revenues through their Chain Drugstore Pharmacies was 5.3% or $19.3 billion.

91.     On or about March 17, 2016, WBA and OptumRx announced a partnership arrangement, effective as of January 1, 2017. As a result of this partnership, OptumRx members will have the option to fill their 90-day prescriptions at mail order copay levels at any Walgreens pharmacy, among other things. OptumRx's share of 2015 Prescription Revenues through their Mail Order Pharmacy was 4.3% or $15.8 billion.

92.     Upon information and belief, and given OptumRx's reach into the prescription drug market, OptumRx's partnership with WBA has substantial impact on AmerisourceBergen's volume of sales to WBA.

93.     In addition to OptumRx's close ties with AmerisourceBergen through its partnership with AmerisourceBergen's partial owners, WBA, on August 24, 2015, OptumRx announced a multi-year agreement with Cardinal to supply generic and brand pharmaceuticals to OptumRx's specialty pharmacy and mail services pharmacy.

94.     This evidences OptumRx's close relationship with two of the Big Three in AmerisourceBergen and Cardinal.

**IV.   OptumRx Announces VAWD-Accredited Policy in an Effort to Drive Market Toward the Big Three**

   ***A.  Background of VAWD and Its Effect on Plaintiff's Member's Business Model***

95.     By way of letter dated August 11, 2016, OptumRx notified each and every of its approximately 67,000 participating pharmacy providers that the terms and conditions of the pharmacies' Pharmacy Network Agreement and Provider Manual with OptumRx was being modified.

96.     More specifically, OptumRx's August 11, 2016 letter stated that "Effective October 1, 2016, changes will be made to the provider manual stating that your pharmacy MUST purchase ALL medications dispensed for claims being dispensed to OptumRx participants from a Verified-Accredited-Wholesale Distributor (VAWD)."

97.     VAWD is an accreditation offered by the National Association Boards of Pharmacy ("NABP"). In order to obtain VAWD accreditation, a wholesaler undergoes a criteria compliance review, which includes a rigorous assessment of the wholesaler's operating policies and procedures, licensure verification, survey of facility and operations, background checks, and screening

procedures. VAWD accredited facilities are reviewed annually and undergo a site survey every three years.

98.     Obtaining VAWD accreditation is not a simple process for a wholesaler. Rather, the process can take more than six (6) months from start to finish, and places an unreasonable monetary burden upon wholesalers seeking the accreditation.

99.     Indeed, according to the NABP website the estimated total for three-year accreditation is $7,500.00 per facility.

100.    Moreover, a wholesaler's accreditation status (unlike a State license) is subject to the changing whims of the accrediting body, and does not afford due process rights or public oversight, like State or Federal licensure.

101.    Critically, Plaintiff's members and other similarly situated Secondary Wholesalers cannot obtain VAWD accreditation and continue utilizing their business model.

102.    In order to receive and retain VAWD accreditation a wholesale distributor must not "engage in the wholesale distribution of Prescription drugs that are **purchased or received from pharmacies or practitioners**, or from wholesale distributors that obtained them from pharmacies or practitioners."

103.    As set forth in detail above, Plaintiff's members and other similarly situated Secondary Wholesalers obtain a portion of their drugs and supplies from pharmacies and practitioners, or obtain their drugs from wholesalers that had previously obtained the drugs from pharmacies and practitioners.

104.    As such, Plaintiff's members' business models, which are fully compliant with all applicable Federal and State law, renders VAWD accreditation a literal impossibility or a significantly impractical without changing these business models overnight or forcing the NABP to make

unlikely exceptions to its VAWD accreditation standards to accommodate these models, which are nevertheless fully compliant with applicable law and regulations.

### B. OptumRx's VAWD-Accreditation Requirement is Unreasonable, Arbitrary, and Unwarranted.

103.     The constraints of this new policy requiring VAWD accreditation puts a new burden on participating pharmacies but also places a *de facto* requirement on the wholesale distributors from which they purchase.

104.     The VAWD-Accreditation Policy could effectively limit the number of pharmacies eligible to participate in OptumRx's network and potentially jeopardize their ability to serve OptumRx's covered patients.

105.     The VAWD-Accreditation Policy will disqualify reputable distributors from serving certain pharmacy customers which could be detrimental to those businesses and, more importantly, to their customers' patients.

106.     This policy may also cause the limiting of patient access to prescription drug products in the near term, and will significantly impede pharmacies' ability to source product from alternate trading partners in cases where products are in short supply.

107.     VAWD is **not** sanctioned by HHS or its "sub-agencies" (including the FDA and CMS) and no Federal law, including the DSCSA, requires wholesale distributors to be VAWD-accredited.

108.     The DSCSA establishes a uniform Federal standard for wholesale distributor licensure and operation, and no State or political subdivision "may establish or continue any standards, requirements, or regulations with respect to" wholesale prescription drug distributors that "are inconsistent with, less stringent than, directly related to, or covered by" the DSCSA's standards and requirements.

109.   Even if a State could continue to mandate VAWD accreditation, the standards against which VAWD inspects and accredits cannot be different than those imposed under the DSCSA.

110.   The enactment of the DSCSA in 2013 established a national, uniform system of requirements to protect patients and help assure the integrity of the pharmaceutical supply chain.

111.   As of January 1, 2015, all entities in the supply chain, including OptumRx's pharmacy network participants, can only engage in transactions – that is, a change in ownership of a product – with authorized trading partners.

112.   The DSCSA defines "authorized trading partner" and places the burden on each trading partner to properly vet their suppliers and customers to ensure they are properly licensed and compliant with DSCSA requirements.

113.   Thus, wholesale distributors and pharmacies may only purchase from entities that are authorized as defined in the DSCSA.

114.   In addition, beginning over a year ago, supply chain participants began tracing product uniformly by exchanging Transaction Information, Transaction History, and Transaction Statements with each transaction, that is, each purchase and sale of products as defined in the DSCSA.

115.   In the Transaction Statement, the entity transferring ownership of a product must attest to the buyer that it: is an authorized trading partner; Received the product from a person that is authorized; received a Transaction Statement from the prior owner of the product and Transaction Information about the product; did not knowingly ship a suspect or illegitimate product; has systems and processes in place to comply with the DSCSA's verification requirements (verification includes the ability to, among other things, investigate whether a product is suspect or

illegitimate); did not knowingly provide false Transaction Information; and did not knowingly alter the product's Transaction History.

116.     Congress carefully constructed these requirements and they are enforceable by FDA and its partner State regulatory agencies. The DSCSA was specifically enacted to enable greater transparency and security in the supply chain.  However, VAWD requirements go well beyond the requirements of the newly enacted law.

117.     Additionally, the DSCSA establishes national, uniform standards for the licensure of wholesale distributors. "For the purpose of ensuring uniformity," FDA must establish by regulation standards that "shall apply to all State and Federal licenses" and shall include standards for the following: the storage and handling of prescription drugs, including facility requirements; the establishment and maintenance of records of the distributions of such drugs; the furnishing of a bond or other equivalent means of security; mandatory background checks and fingerprinting of facility managers or designated representatives; The establishment and implementation of qualifications for key personnel; the mandatory physical inspection of any facility following the facility's initial licensure application; prohibitions of certain persons from receiving or maintaining a wholesale distributor license.  The existing law is sufficient to protect the supply chain without requiring VAWD accreditation.

118.     FDA regulations implementing these licensure standards are expected at the end of 2016.  These regulations will be promulgated and adopted under the Administrative Procedure Act, pursuant to proper notice and comment.

119.     The DSCSA, therefore, provides protections to assure that only authorized entities buy and sell drugs, that those transactions are documented, and that wholesale distributors operate in accordance with national standards.

120.    In contrast, the VAWD program has no legal significance and VAWD has no regulatory authority to enforce these provisions over any supply chain entity, thus making OptumRx's VAWD-Accreditation Policy unnecessary and unduly burdensome.

### C.  OptumRx Has Implemented its VAWD-Accreditation Policy in An Effort to Drive Market Share Toward the Big Three Wholesalers in Exchange for More Favorable Pricing Terms

121.    The pharmaceutical delivery system is incredibly complex, with a myriad of moving parts, behind-the-scenes deals, and strategic alliances.

122.    Upon information and belief, large players, including OptumRx as one of the country's largest PBMs, form dozens of intricate agreements with other entities, such as manufacturers, wholesalers, insurance companies, technology companies, and pharmacies, all aimed at integrating the prescription drug delivery system.

123.    As mentioned, and based upon information and belief, OptumRx has substantial relationships with both Cardinal (through an August 2015 purchase agreement) and AmerisourceBergen (through a partnership with WBA).

124.    Upon information and belief, OptumRx also receives substantial rebates from manufacturers and primary wholesalers.

125.    Upon information and belief, OptumRx derives a financial incentive, or direct or indirect benefit, by requiring VAWD accreditation of wholesalers selling to its member pharmacies, as this VAWD-Accreditation Policy will have a negative impact on competitors of the Big Three (such as Plaintiff's members).

### V.    The VAWD-Accreditation Policy Constitutes Final Agency Action By HHS Defendants In Violation of the Administrative Procedure Act

126.    As noted above, OptumRx manages Part D prescription drug plans as a First Tier entity.

127.    Thus, the VAWD-Accreditation Policy constitutes final agency action on behalf of the HHS Defendants.

128.    Through the promulgation of multiple "Reorganization Plans" over the span of decades, *see generally* 5 U.S.C. App., Congress, working in concert with the Executive Branch, created the United States Department of Health and Human Services (HHS) and imbued it with certain, but limited regulatory authority.  *See* 42 U.S.C. §§ 1395hh, *et seq.*

129.    In particular, the law requires that the Secretary of HHS "*shall* prescribe such regulations as may be necessary to carry out the administration of the insurance programs under this subchapter. When used in this subchapter, the term 'regulations' means, unless the context otherwise requires, regulations prescribed by the Secretary." 42 U.S.C. § 1395hh(a)(1) (emphasis added).

130.    More importantly, the law also requires that "[n]o rule, requirement, or other statement of policy (other than a national coverage determination) that establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, *or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits* under this subchapter shall take effect unless it is promulgated by the Secretary by regulation under [42 U.S.C. § 1395hh(a)(1)]." 42 U.S.C. § 1395hh(a)(2) (emphasis added).

131.    The Centers for Medicare & Medicaid Services ("CMS") is the "sub-agency" within HHS charged by the Secretary of HHS with administering the Medicare program, including Medicare Part D, which was enacted by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003. *See generally* 42 U.S.C. §§ 1395w-101, *et seq.*

132.    Under the Federal framework and with the permission of Congress and HHS, CMS contracts with Plan Sponsors to administer enrollees' prescription drug benefits under Medicare Part

D.  *See* 42 U.S.C. § 1395w-112, *et seq.* (providing the statutory requirements governing CMS' contracts with prescription drug plan ["PDP"] sponsors).

133.   Plan sponsors likewise contract with "First Tier Entities" (e.g. PBMs such as OptumRx) to administer services rendered to Medicare enrollees.  *See* 42 C.F.R. § 423.4 ("First tier entity means any party that enters into a written arrangement, ***acceptable to CMS***, with a Part D plan sponsor or applicant to provide administrative services or health care services for a Medicare eligible individual under Part D.") (emphasis added).

134.   In turn, these "first tier entities" contract with pharmacy providers, or "downstream entities", to create the Medicare Part D infrastructure necessary to fulfil the legislative intent of Congress to provide prescription drug benefits directly to Medicare enrollees.  *See* 42 C.F.R. § 423.4 ("Downstream entity means any party that enters into a written arrangement, ***acceptable to CMS***, with persons or entities involved with the Part D benefit, below the level of the arrangement between a Part D plan sponsor (or applicant) and a first tier entity. These written arrangements continue down to the level of the ultimate provider of both health and administrative services.") (emphasis added).

135.   With each successive entity's involvement in the Medicare Part D program, their legal rights and duties are constrained through contractual agreements down the chain of privity from CMS to the ultimate provider, the terms of which must be "acceptable to CMS".  *See, e.g.,* 42 C.F.R. § 423.505, *et seq.* (providing regulatory requirements for Part D contract provisions).

136.   Plaintiff's members are "downstream" entities because they enter into written arrangements with OptumRx's participating pharmacy providers, many of whom are "involved with the Part D benefit, below the level of the arrangement between a Part D plan sponsor (or applicant) and a first tier entity."

137.     OptumRx is a "first tier" entity with delegated authority or a "PDP Sponsor" who must "comply with all applicable Federal laws, regulations, and CMS instructions."  42 C.F.R. § 423.505, *et seq.*

138.     Beyond being simply bound by all applicable Federal laws, regulations, and CMS instructions**,** OptumRx is acting as an agent of the Federal Government in their administration of Medicare Part D.

139.     OptumRx's VAWD-Accreditation Policy is a "rule, requirement, or other statement of policy" and, as such, must be a product of informal rule making by the HHS Defendants pursuant to 42 U.S.C. § 1395hh and 5 U.S.C. § 553.   As such, the Policy must follow the agency rule making process.

## VI.     Nature of Plaintiff's Member's Harm if OptumRx Implements Its VAWD-Accreditation Policy

140.     The implementation of OptumRx's VAWD-Accreditation Policy will create an immediate and irreparable harm to Plaintiff's members and similarly situated secondary wholesalers in the marketplace as well as numerous independent pharmacies throughout the country.

141.     If OptumRx is permitted to continue to implement its VAWD-Accreditation Policy, Plaintiff' members will lose revenue from pharmacies that process claims for OptumRx beneficiaries. Plaintiff's members have been informed by pharmacies that the pharmacies have stopped and will continue to stop ordering medications from Plaintiff's members if the pharmacies cannot dispense medications from Plaintiff's members to OptumRx beneficiaries.

142.     It is customary for pharmacies to only order medications from wholesalers that can be dispensed to beneficiaries of many, if not all, insurance companies.

143.     This is because it is neither practical nor convenient for the pharmacy to spend time determining whether a particular medication being dispensed to an OptumRx beneficiary originated from a VAWD-accredited wholesaler or a non-VAWD accredited wholesaler.

144.    Therefore, if OptumRx's policy is allowed to continue, Plaintiff's members have been notified by client-pharmacies that the pharmacies will cease placing orders with Plaintiff's members and begin ordering medications strictly from VAWD-accredited wholesalers. In several instances, Plaintiff's members' client-pharmacies have ceased placing orders with Plaintiff's members and are ordering medications strictly from VAWD-accredited wholesalers

145.    Additionally, OptumRx's policy, which disallows pharmacies from ordering medication through non-VAWD accredited wholesalers, will result in irreparable harm to Plaintiff's members' reputation, as pharmacies will undoubtedly believe that non-VAWD accredited wholesalers are inferior to VAWD-accredited wholesalers.

146.    By way of example, and not limitation, several pharmacy-customers of AIPW member HealthSource Distributors, LLC have ceased doing business with HealthSource Distributors and have advised that they will only recommence doing business with HealthSource Distributors if it can provide proof of VAWD accreditation, going so far as explicitly indicating, "Please confirm that you are compliant with all Optum Rx new VAWD requirements. If you are not, we can not do business with you guys."   As a subsequent example, another customer indicated that "After reviewing the new standards set forth by OptumRx…we are auditing all wholesalers that [customer] is currently purchasing from. Please forward…VAWD Accreditation and OptumRx approval letter. Should we not have these before 2/28/2017, we will discontinue purchasing from your company."

147.    At least fifty (50) pharmacy-customers of AIPW member Matrix Distributors, Inc. have discontinued doing business with Matrix Distributors, Inc. and will only recommence doing business with Matrix Distributors, Inc. if it can provide proof of VAWD accreditation.

148.    At least one customer of AIPW member PriMed Pharmaceuticals has ceased doing business with PriMed Pharmaceuticals unless it gains VAWD accreditation.   Furthermore, this

particular customer has indicated that it will terminate its endorsement of PriMed Pharmaceuticals as a "preferred vendor."

**VII.     Nature of Harm to Pharmacies and Patients**

149.     Not only will Plaintiff's members and other similarly situated Secondary Wholesalers be irreparably harmed by OptumRx's policy, but so will independent pharmacies and patients.

150.     There are numerous independent pharmacies throughout the country that rely on Plaintiff's members and similarly situated secondary wholesalers to obtain life-saving medications for their patients.

151.     These pharmacies are often unable to obtain medications from the Big Three and other large wholesalers because they fail to meet the larger wholesaler's minimum purchasing requirements.

152.     Additionally, Plaintiff's members and other similarly situated secondary wholesalers' business model allows pharmacies to obtain medications at a lower cost, which helps the independent pharmacies obtain a larger margin of profit.  *See, e.g.*, United States Department of Health and Human Services ("HHS") and the United States Food and Drug Administration ("FDA"), The Prescription Drug Marketing Act: Report to Congress, at 15 (June 2001), available at http://www.fda.gov/downloads/RegulatoryInformation/Legislation/SignificantAmendmentstothe FDCAct/PrescriptionDrugMarketingActof1987/UCM203186.pdf (generally noting "the secondary wholesale market operates on an arbitrage system whereby secondary distributors, by purchasing and selling drugs at discounts offered by manufacturers and other distributors, help to keep drug prices lower overall for consumers than they would otherwise be without the presence of secondary distributors.").

153.    With the removal of this crucial "arbitrage system" from the drug supply chain, the consequences could prove dire for ultimate consumers and taxpayers in the form of increased drug pricing across the industry.

154.    Such dire consequences for ultimate consumers and taxpayers are a direct result of the VAWD-Accreditation Policy, which is immoral, oppressive, and substantially injurious to consumers.

155.    Without the ability to purchase medications from Plaintiff's members and other similarly situated secondary wholesalers, a number of pharmacies throughout the United States will have difficulty obtaining the medications necessary to service their patients.

156.    The inability of pharmacies to purchase medications from secondary wholesalers, such as the members of AIPW, is a direct result of the VAWD-Accreditation Policy, which is immoral, oppressive, and injurious to consumers.

157.    If Secondary Wholesalers are removed from the marketplace in this fashion, there will be drastic negative consequences for patients, providers, and the drug marketplace in general.  This includes, but is not limited to: increased waste of drug supplies, shortened supplies (and commensurate decrease in patient access to prescription drugs), and increased average wholesale pricing and/or wholesale acquisition costs which could prove to be financially catastrophic to OptumRx's participating providers.

158.    The pharmacies that are lucky enough to find alternative means of obtaining the necessary supply of medications for their patients will suffer smaller profit margins, as the Big Three and Other Large Wholesalers sell medications at a higher cost.

159.    Many smaller, independent pharmacies that cannot meet large wholesaler's minimum purchasing requirements or, alternatively, cannot absorb smaller profit margins from larger wholesalers may resultantly be forced to cease operations.  As a result, the patients of those

pharmacies that have ceased operations will be forced to find alternative methods to obtain their medications.

## COUNT ONE
## VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT ("APA")
### (Against HHS Defendants)

160.    Plaintiff repeats and reiterates the factual allegations set forth above as it set forth at length herein.

161.    The contract term of adherence adopted by OptumRx, which requires that all "downstream entities" in the form of OptumRx's participating providers to purchase drug products for dispensation to Medicare enrollees only from VAWD accredited wholesalers—is necessarily "a rule, requirement, or other statement of policy (other than a national coverage determination) that establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits".  42 U.S.C. § 1395hh(a)(2).

162.    OptumRx is a "first tier" entity with delegated authority or a "PDP Sponsor" who must "comply with all applicable Federal laws, regulations, and CMS instructions."  42 C.F.R. § 423.505, *et seq.*  Beyond being simply bound by all applicable Federal laws, regulations, and CMS instructions, OptumRx is an agent of the Federal Government in their administration of Medicare Part D.

163.    As a result, an informal rule making (including notice and comment) by HHS (or CMS acting with duly delegated authority) pursuant to 42 U.S.C. § 1395hh, *et seq.* and 5 U.S.C. § 553, *et seq.* is required for the VAWD accreditation "rule, requirement, or other statement of policy" established by OptumRx to be effective as against "downstream entities"—such as Plaintiff's

members and their customers—who "furnish" Medicare "services or benefits" to Medicare enrollees.

164.    HHS and/or CMS' "failure to act" or the "equivalent or denial" of providing the required informal rule making for the VAWD accreditation "rule, requirement, or other statement of policy", which "establishes or changes a substantive legal standard governing . . . the eligibility of individuals, entities, or organizations to furnish or receive services or benefits" constitutes an "agency action" as defined in the APA pursuant to 5 U.S.C. § 551(13).

165.    Plaintiff seeks an injunction from this Court pursuant to 5 U.S.C. § 706(1): (I) compelling HHS to order OptumRx to rescind its VAWD accreditation "rule, requirement, or other statement of policy" as it relates to governmental health programs; and (II) requiring that the VAWD accreditation "rule, requirement, or other statement of policy" go through the informal rulemaking process as set forth in 5 U.S.C. §§ 553 and 42 U.S.C. §§ 1395hh, *et seq.*, before becoming effective as a substantive legal standard for any governmental health program, particularly Medicare and Medicaid.

166.    Plaintiff seeks declaratory judgment from this Court pursuant to 5 U.S.C. § 706(2)(A) that Defendants' VAWD accreditation "rule, requirement, or other statement of policy" violates 42 U.S.C. § 1395hh, *et seq.* and the APA, and should be set aside as being "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

167.    Plaintiff seeks declaratory judgment from this Court pursuant to 5 U.S.C. § 706(2)(C) that Defendants' VAWD accreditation "rule, requirement, or other statement of policy" violates 42 U.S.C. § 1395hh, *et seq.* and the APA, and should be set aside as being "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

168.    Plaintiff seeks declaratory judgment from this Court pursuant to 5 U.S.C. § 706(2)(D) that Defendants' VAWD accreditation "rule, requirement, or other statement of policy"

violates 42 U.S.C. § 1395hh, *et seq.* and the APA, and should be set aside as being promulgated "without observance of procedure required by law."

**WHEREFORE**, Plaintiff hereby demands judgment in its favor and against HHS Defendants as follows:

a) Declaring that HHS Defendants' VAWD accreditation "rule, requirement, or other statement of policy" is in violation of the rule making process set forth in 42 U.S.C. § 1395hh, *et seq.* and generally under the APA, particularly 5 U.S.C. § 553, and must be set aside pursuant to 5 U.S.C. § 706(2), *et seq.*

b) Preliminary injunction against each Defendant, particularly OptumRx, from effectuating its VAWD accreditation "rule, requirement, or other statement of policy" as against "downstream entities" such as Plaintiff's members in violation of 42 U.S.C. § 1395hh, *et seq.* and the APA;

c) Such other relief as this Court deems just and proper.

## COUNT TWO
## DECLARATORY JUDGMENT
### (Against OptumRx and HHS Defendants)

169.    Plaintiff repeats and reiterates the factual allegations set forth above as it set forth at length herein.

170.    An actual, immediate, substantial, and justiciable controversy has arisen between Plaintiff, OptumRx, and HHS Defendants concerning Plaintiff's members' legal rights to distribute pharmaceutical drug products to OptumRx's network pharmacies.

171.    Plaintiff's members are "downstream" entities because they enter into written arrangements with OptumRx's participating pharmacy providers, many of whom are "involved with the Part D benefit, below the level of the arrangement between a Part D plan sponsor (or applicant) and a first tier entity."

172.    OptumRx is a "first tier" entity with delegated authority or a "PDP Sponsor" who must "comply with all applicable Federal laws, regulations, and CMS instructions." 42 C.F.R. § 423.505, *et seq.* Beyond being simply bound by all applicable Federal laws, regulations, and CMS instructions, OptumRx is an agent of the Federal Government, specifically HHS Defendants, in their administration of Medicare Part D.

173.    As contracted administrators of Medicare Part D and agents clothed in the authority of the government, unlawful actions taken by OptumRx—such as the imposition of a contract term which unreasonably restrains trade, constitutes unfair competition, tortuously interferes with third-party contracts and economic relations, and/or usurps the authority or regulations of the FDA and/or CMS—may properly be challenged in court.

174.    An actual, immediate, substantial, and justiciable controversy has arisen between Plaintiff, OptumRx, and HHS Defendants concerning OptumRx's legal authority, when acting as a "first tier" entity or Part D Plan Sponsor, to require "downstream" entities, such as OptumRx's participating pharmacy providers, to purchase prescription drugs from wholesalers who are accredited by an unapproved accreditation organization for a standard (i.e. VAWD accreditation) under Part D which has not received proper approval from CMS pursuant to the process set out in 42 C.F.R. § 423.168, *et seq.*

175.    An actual, immediate, substantial, and justiciable controversy has arisen between Plaintiff and OptumRx concerning OptumRx's legal authority, when acting as a "first tier" entity or Part D Plan Sponsor, to require "downstream" entities, such as Plaintiff's members, to be accredited by an unapproved accreditation organization for a standard (i.e. VAWD accreditation) under Part D which has not received proper approval from CMS pursuant to the process set out in 42 C.F.R. § 423.168, *et seq.*

176.     Plaintiff seeks declaratory judgment from this Court that OptumRx's contract term imposing the requirement that its participating pharmacy providers be required to purchase their inventory only from VAWD accredited wholesalers violates CMS regulations and is void as a matter of law and/or public policy.

**WHEREFORE**, Plaintiff hereby demands judgment in its favor and against OptumRx as follows:

a)   Declaring that OptumRx's and HHS Defendants' VAWD-Accreditation Policy is in violation of the process set forth in 42 C.F.R. § 423.168, *et seq.*

b)   Preliminary injunction against OptumRx and HHS Defendants from continuing its VAWD-Accreditation policy;

c)   Reimbursement for any sum of money damages as suffered by Plaintiff's members;

d)   Such other relief as this Court deems just and proper.

**COUNT THREE**
**VIOLATION OF THE REGULATORY FLEXIBILITY ACT, 5 U.S.C. § 601 *et seq.***
**(As to HHS Defendants)**

177.     Plaintiff repeats and reiterates the factual allegations set forth above as it set forth at length herein.

178.     Under the Regulatory Flexibility Act ("RFA"), a final agency rule must contain a final "regulatory flexibility analysis," which gives "a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected." 5 U.S.C. §604(a)(6).

179.     As set forth above, the VAWD-Accreditation Policy constitutes final agency rulemaking.

180.   The HHS Defendants failed to comply with the RFA by failing to provide a description of the steps CMS and HHS had taken to minimize the significant economic impact on small entities of the VAWD-Accreditation Policy. Similarly, the HHS Defendants failed to provide a statement regarding whether there were any viable alternatives to the VAWD-Accreditation Policy and why each of those potential alternatives was rejected.

181.   Because the HHS Defendants failed to comply with the RFA, the VAWD-Accreditation Policy was promulgated "without observance of procedure required by law" and must be vacated. 5 U.S.C. §706(2)(D).

**WHEREFORE**, Plaintiff hereby demands judgment in its favor and against HHS Defendants as follows:

a) Declaring that HHS Defendants' VAWD accreditation "rule, requirement, or other statement of policy" is in violation of the RFA, 5 US.C. §601 *et seq.*, and must be set aside pursuant to 5 U.S.C. § 706(2), *et seq.*

b) Preliminary injunction against Defendants, enjoining Defendants from effectuating the VAWD accreditation "rule, requirement, or other statement of policy" as against "downstream entities" such as Plaintiff's members in violation of the RFA and the APA;

c) Such other relief as this Court deems just and proper.

### COUNT FOUR
### UNFAIR COMPETITION IN VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17200, *et seq.*
### (Against OptumRx)

182.   Plaintiff repeats and reiterates the factual allegations set forth above as it set forth at length herein.

183.   Business and Professions Code section 17200 *et seq.* (the "Unfair Competition Law" or "UCL") prohibits any unlawful, unfair or fraudulent business act or practice, any unfair deceptive,

untrue or misleading advertising, and any violation of Business and Professions Code section 17500 *et seq.*

184.    OptumRx's implementation of the VAWD-Accreditation Policy constitutes an unlawful, unfair and fraudulent business practice.

185.    Plaintiff's members have suffered and will continue to suffer an injury in fact as a result of OptumRx's unlawful, unfair and fraudulent methods of competition.

**WHEREFORE**, Plaintiff hereby demands judgment in its favor and against OptumRx as follows:

a)    Declaring that OptumRx engaged in unfair methods of competition, in violation of California Business and Professions Code Section 17200, *et seq.*;

b)    Preliminarily enjoining OptumRx from continuing its VAWD-Accreditation Policy;

c)    Reimbursement for any sum of money damages suffered by Plaintiff's members as a result of OptumRx's intention to implement its VAWD-Accreditation policy;

d)    Attorney's fees and costs of suit; and

e)    All other relief this Court deems just and proper.

## COUNT FIVE
## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (Against OptumRx)

186.    Plaintiff repeats and reiterates the factual allegations set forth above as it set forth at length herein.

187.    Plaintiff's members have established economic relationships with numerous pharmacy clients that utilized Plaintiff's members' services to the substantial benefit of Plaintiff's members. OptumRx knew of these economic relationships.

188.    As described at length herein, OptumRx's implementation of its VAWD-Accreditation Policy was designed to disrupt the economic relationships between Plaintiff's

members and their clients, and indeed, the relationships were disrupted as a result of OptumRx's policy such that prospective customers and merchants have declined to do business with Plaintiff member or similarly situated independent wholesalers.

189.    OptumRx's VAWD-Accreditation Policy constitutes an unfair trade practice in violation of Business and Professional Code section 17200.

190.    As a proximate result of OptumRx's conduct, Plaintiff's members have suffered and will continue to suffer significant damages, including, but not limited to, lost revenue and lost profits caused by the substantial disruption in the economic relationship between Plaintiff's members and their pharmacy clients.

191.    Specifically, OptumRx has interfered with AIPW-member HealthSource Distributors, LLC's economic relationships by way of the VAWD-Accreditation Policy, which has caused several of its client-pharmacies to cease doing business with HealthSource Distributors, LLC.

192.    Due to OptumRx's interference, at least fifty (50) client-pharmacies of AIPW member Matrix Distributors, Inc. have discontinued doing business with Matrix Distributors, Inc.

193.    At least one client-pharmacy of AIPW member PriMed Pharmaceuticals has ceased doing business with PriMed Pharmaceuticals due to OptumRx's interference.

194.    The conduct of OptumRx in interfering with Plaintiff's member's economic relationships was intentional, willful, and calculated to cause damage to Plaintiff's members' lawful businesses. Further, the conduct of OptumRx was perpetrated with actual malice and ill will toward Plaintiff's members, and with the intentional and improper purpose of causing damage. There was no justifiable cause for OptumRx's implementation of its policy. As a result, an award of punitive damages is warranted.

**WHEREFORE**, Plaintiff hereby demands judgment in its favor and against OptumRx as follows:

a)   Preliminary injunction against OptumRx from continuing its VAWD-Accreditation policy;

b)   Judgment against OptumRx for tortuously interfering with Plaintiff's members economic advantage;

c)   Reimbursement for any sum of money damages as suffered by Plaintiff's members;

d)   Such other relief as this Court deems just and proper.

## COUNT SIX
## TORTIOUS INTERFERENCE WITH CONTRACT
### (Against OptumRx)

195.    Plaintiff repeats and reiterates the factual allegations set forth above as it set forth at length herein.

196.    Plaintiff's members established ongoing contractual and transactional relationships with pharmacies to provide them with medications.

197.    OptumRx was aware of the ongoing contractual and transactional relationships that Plaintiff's members had established with numerous pharmacies throughout the United States.

198.    OptumRx intentionally interfered with Plaintiff's member's contractual and transactional relationship with their client-pharmacies by arbitrarily imposing the VAWD-Accreditation Policy upon pharmacies with the intent to drive Plaintiff's members out of business.

199.    OptumRx was not justified in interfering with, and used improper means to interfere with, Plaintiff's members' contractual relationship with its pharmacy clients.

200.    OptumRx's VAWD-Accreditation Policy has resulted in the disruption of Plaintiff's members' contractual and transactional relationship with its pharmacy clients.

201.    As a result, Plaintiff's members' have suffered and will continue to suffer significant damages, including, but not limited to, lost revenue and net profits caused by the substantial disruption in Plaintiff's members' contractual and transactional relationships with their pharmacy clients.

202.    The conduct of OptumRx in interfering with Plaintiff's members contractual and transactional relationships with its pharmacy clients was intentional, willful, and calculated to cause damage to Plaintiff's members' lawful businesses. Further, the conduct of OptumRx was perpetrated with actual malice and ill will toward Plaintiff's members, and with the intentional and improper purpose of causing damage to such members. There was no justifiable cause for OptumRx's implementation of its policy. As a result, an award of punitive damages is warranted.

**WHEREFORE**, Plaintiff hereby demands judgment in its favor and against OptumRx as follows:

a)  Preliminary injunction against OptumRx from continuing its VAWD-Accreditation Policy;

b)  Judgment against OptumRx for tortuously interfering with Plaintiff's members' contractual relations;

c)  Reimbursement for any sum of money damages as suffered by Plaintiff's members;

d)   Such other relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.


Dated: February 17, 2017

 */s/ Todd Mizeski*                                    
**FRIER & LEVITT, LLC**
Todd Mizeski, Esq. (D.C. Bar No. 479675)
Jonathan E. Levitt, Esq. (Admitted Pro Hac Vice)
Steven L. Bennet, Esq. (Admitted Pro Hac Vice)
Andrew J. D. Russo, Esq. (Admitted Pro Hac Vice)
84 Bloomfield Avenue
Pine Brook, NJ 07058
Telephone: (973) 618-1660
Facsimile: (973) 618-0650
tmizeski@frierlevitt.com
jlevitt@frierlevitt.com
sbennet@frierlevitt.com
arusso@frierlevitt.com

Attorneys for Plaintiff, Association of Independent
Pharmaceutical Wholesalers, Inc.

## CERTIFICATION OF SERVICE

I, Todd Mizeski, Esq., of full age, do hereby certify that on the date set forth below, a copy of Plaintiff's First Amended Complaint, were fielded electronically and served on counsel of Record:

Charles B. Rogers
Jason R. Asmus
Briggs and Morgan, Professional Association

Edward T. Kang
Alston & Bird, LLP

Teresa L. Jakubowski, Esq.
Barnes & Thornburg, LLP

Peter J. Phipps, Esq.
United States Department of Justice
Civil Division, Federal Programs Branch

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: February 17, 2017

   /s/ Todd Mizeski_____
**FRIER & LEVITT, LLC**
Todd Mizeski, Esq. (D.C. Bar No. 479675)
Jonathan E. Levitt, Esq. (Admitted Pro Hac Vice)
Steven L. Bennet, Esq. (Admitted Pro Hac Vice)
Andrew J. D. Russo, Esq. (Admitted Pro Hac Vice)
84 Bloomfield Avenue
Pine Brook, NJ 07058
Telephone: (973) 618-1660
Facsimile: (973) 618-0650
tmizeski@frierlevitt.com
jlevitt@frierlevitt.com
sbennet@frierlevitt.com
arusso@frierlevitt.com

Attorneys for Plaintiff, Association of Independent
Pharmaceutical Wholesalers, Inc.