1

1              UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLUMBIA

3

4

5    ASSOCIATION OF INDEPENDENT          :
     PHARMACEUTICAL WHOLESALERS, INC.,   :
6                                        :
                  Plaintiff,             :
7                                        :  CA NO. 16-2214
     v.                                  :
8                                        :
     OPTUMRX, INC., et al.,              :
9                                        :
                  Defendants.            :
10   ---------------------------------------------------------

11             TRANSCRIPT OF MOTIONS HEARING

12       BEFORE THE HONORABLE KETANJI BROWN JACKSON

13             UNITED STATES DISTRICT JUDGE

14             Wednesday, October 25, 2017

15   APPEARANCES:

16     For the Plaintiff:   Jonathan Levitt, Esq.
                            FRIER & LEVITT, LLC
17                          84 Bloomfield Ave.
                            Pine Brook, NJ 07058
18
       For the Defendant:   Jason R. Asmus, Esq.
19                          BRIGGS AND MORGAN, P.A.
                            2200 IDS Center
20                          80 South 8th Street
                            Minneapolis, MN 55402
21

22

23   Proceedings reported by machine shorthand, transcript

24   produced by computer-aided transcription.

25

```
 1                      P R O C E E D I N G S
 2                 DEPUTY CLERK:  Okay.  Your Honor, this
 3    is Civil Action 16-2214, Association of Independent
 4    Pharmaceutical Wholesalers, Inc. v. OptumRx.  Will
 5    counsel please approach the podium and identify
 6    yourselves for the record as well as any additional
 7    parties at your table.
 8                 MR. LEVITT:  Jonathan Levitt from the
 9    law firm of Frier & Levitt for the plaintiff,
10    Association of Independent Pharmaceutical Wholesalers.
11                 THE COURT:  Good morning.
12                 MS. YOUNG:  Danielle Young on behalf of
13    the federal defendants, Your Honor.  I'm here with
14    Jonathan Bremner from HHS and Joel McElvain from the
15    Department of Justice.
16                 THE COURT:  Good morning.
17                 MR. ASMUS:  Good morning, Your Honor.
18    Jason Asmus from Briggs & Morgan in Minneapolis here on
19    behalf of OptumRx.  Also with me is Kelley Barnaby at
20    counsel table from Alston & Bird.  Also in the
21    courtroom, Your Honor, we have Kerri Tanner, who is a
22    senior vice president at OptumRx and also Brian
23    Thompson, who is associate general counsel.
24                 THE COURT:  All right.  Thank you all
25    for being here.  The Court scheduled this hearing in
```

1    order to give the parties in this matter the opportunity

2    to provide argument and hopefully insight with respect

3    to the dispositive motions, which are the two motions to

4    dismiss the complaint that OptumRx and the federal

5    defendants have filed.

6              I have reviewed your briefs, I'm

7    familiar with the arguments, but you should certainly

8    feel free to restate them as you think may be necessary

9    in order to provide me with background detail and to

10   make sure that the issues are illuminated.  And, of

11   course, because the purpose of this hearing is to

12   provide the Court with the information that it needs in

13   order to decide the motions, I will be asking questions,

14   although I'll try not to interrupt you too much.  But

15   you should rest assured that my asking questions means

16   that I'm interested and engaged and want to understand

17   the arguments that you're making.

18              As far as the procedure that I follow,

19   I really don't like to have time limits with respect to

20   argument.  I find them distracting, and I do follow a

21   slightly unconventional pattern insofar as I typically

22   ask Plaintiff's counsel to speak first with respect to

23   motions to dismiss.  You can tell us what this case is

24   about and the claims that have been brought.  I'm likely

25   to ask you some questions to make sure I understand the

4

1   claims.  And then I'll turn to defense counsel to

2   explain why the claims as addressed by the, by

3   Plaintiff's counsel should be dismissed.

4                 Now, I understand that we have more

5   than one defendant in this case.  We have different

6   motions.  So I'm wondering as between the defendants

7   whether you've talked about how you're going to argue,

8   whether both will argue.  Maybe Mr. Asmus, if you want

9   to tell me.

10                MR. ASMUS:  Your Honor.  We've talked

11  briefly.  There are basically three subject areas that

12  the defendants cover in their briefing.  They're what I

13  would call procedural issues with respect to the amended

14  complaint and the issue of standing, which I'm intending

15  to cover.

16                THE COURT:  Okay.

17                MR. ASMUS:  Then Counts I through III,

18  Counts I and III are asserted only against the federal

19  defendants.  Count II is also against Optum.  The

20  federal defendants counsel is planning to address those

21  three counts.

22                THE COURT:  Okay.

23                MR. ASMUS:  And I would address the

24  state law counts in Counts IV through VI and any

25  follow-up that the Court may have as to Count II

1    relating to Optum, if necessary.

2                    THE COURT:  All right.  Well, I mean,

3    that's fine.  I let you organize it however you want.

4    It may involve some sort of popping up here and there

5    because I don't know how these things are going to come

6    up in our discussion.

7                    MR. ASMUS:  Certainly.

8                    THE COURT:  But I trust you all to know

9    which counsel is supposed to be handling what when those

10   questions arise.

11                   MR. ASMUS:  And we can adjust on the

12   fly if we need to.

13                   THE COURT:  All right.  Thank you.  So

14   as I said, we'll start with Plaintiff's counsel, then

15   we'll have OptumRx and the federal government counsel

16   discuss their reasons for dismissal.  If necessary,

17   we'll have Plaintiff respond to various parts as we go

18   along so that we don't get too far afield.  And I will

19   certainly entertain any replies.  All right?

20                   So good morning, sir.  You may come

21   forward, Mr. Levitt.

22                   MR. LEVITT:  Thank you, Judge.  Good

23   morning.

24                   THE COURT:  Good morning.

25                   MR. LEVITT:  Jonathan Levitt from Frier

1    Levitt on behalf of the plaintiff.

2              This plaintiff is an association that

3    is comprised of wholesalers making up this secondary

4    market.  So before talking about the secondary market,

5    I'll just mention what is the primary market.

6    Essentially they are the big three, three public

7    companies make up the big three.  AmerisourceBergen,

8    Cardinal and McKesson are the three public companies

9    that make up three-quarters of all drugs that are sold

10   in the country.

11             There's a, there's sort of a middle

12   tier, very large players that are made up -- it's not

13   necessary for me to get into the names of them, but

14   there's also multibillion dollar companies that are

15   privately held but in the primary space.

16             So the secondary wholesalers, they make

17   up an important part of our healthcare system and an

18   important part of Medicare, and Medicare obviously is

19   our federal healthcare program which has a Part D, which

20   is the drug component of it.  These members do something

21   that is not permitted by VAWD, the Verified Accredited

22   Wholesaler Distributor accreditation by the National

23   Association of Boards of Pharmacy.

24             The one thing they do that VAWD frowns

25   upon is in the secondary wholesale market; the

1    wholesalers acquire drugs in part from pharmacies.  And

2    you can not take my word for it but more importantly

3    take the word from HHS, which is here today, through

4    counsel and also the Food and Drug Administration at the

5    FDA.

6              Also, the secondary wholesale

7    marketplace for the drug buying is a very important part

8    of our healthcare system, because it allows drugs to be

9    sold at discounts offered by distributors and helps keep

10   drug prices lower overall for consumers that they would

11   otherwise be without the presence of the secondary

12   distributors.

13             THE COURT:  All right.  So they play an

14   important role.

15             MR. LEVITT:  Absolutely.

16             THE COURT:  Tell me what the basis of

17   your claims are.

18             MR. LEVITT:  Okay.  So the basis of the

19   claim is, as I said, they play an important role, and --

20   but in August 2016 Optum wrote a letter to all the

21   pharmacies in the country that are part of Optum's

22   network.  I think it's also an important part of the

23   background information to understand what is Optum and

24   do they play an important role.

25             Optum is a pharmacy benefit manager,

1    PBM, and they are owned by UnitedHealthcare.

2    UnitedHealthcare obviously is a public company and one

3    of the biggest plan sponsors the United States.  So

4    UnitedHealthcare is an insurance company, and one of the

5    things that they do is they administer the medical

6    benefit and they're a subsidiary of Optum, which is one

7    of the defendants here and manages the drug benefit.

8                  THE COURT:  What does that mean?  So

9    UnitedHealthcare is a private company, right?

10                 MR. LEVITT:  Publicly traded company.

11                 THE COURT:  Publicly traded company,

12   but what I mean is it's not a government entity.

13                 MR. LEVITT:  It's not a government

14   entity, Judge.  It is owned by shareholders.

15                 THE COURT:  Right.

16                 MR. LEVITT:  Private shareholders.  But

17   there is no doubt that they administer part of the

18   Medicare program.  And so --

19                 THE COURT:  Just like other healthcare

20   entities do.

21                 MR. LEVITT:  Well, not so much.  It

22   depends on what you mean by "healthcare entities."

23                 THE COURT:  I mean doctors, hospitals,

24   everybody who does healthcare to some degree and

25   services people who use Medicare, Medicaid, you could

1    say, are administering that program; right?

2                    MR. LEVITT:  Right, but I wouldn't --

3    no, I wouldn't say that, no.  I would draw a very

4    important distinction for the purpose of this motion

5    between providers like doctors and a PBM in a health

6    insurance company for the following reasons:

7                    The Medicare healthcare program is

8    created by the Social Security Act, and the Social

9    Security Act also created HHS and CMS, the Center for

10   Medicare and Medicaid Studies.  So CMS monitors --

11   they're tasked with the legal obligation to administer

12   the Part D drug program.  But CMS doesn't know how to

13   process a drug claim.  They don't know how to organize

14   physicians together, and so CMS goes out to the

15   marketplace and they hire what you called a private

16   company to administer that program.

17                   But they don't -- but it is very, and

18   the Social Security Act says, it establishes CMS and

19   also establishes what is a plan sponsor, and the Social

20   Security Act calls a plan sponsor, they created the name

21   "plan sponsor."  They also created -- the plan sponsor

22   in this case is UnitedHealthcare in one sense.

23                   THE COURT:  Let me just, because I'm

24   still struggling with how that's any different than the

25   services side.

1          MR. LEVITT:  Okay.

2          THE COURT:  So is your suggestion that

3    CMS has more of an administrative role in processing

4    claims for services?  My understanding is that CMS also

5    contracts with various entities to process claims for

6    services, you know.  So is drugs different than that?

7          MR. LEVITT:  It is, Judge.  Pharmacies

8    don't enter into a contract with Medicare.  They enter

9    into a contract with the PBM.  So in between the

10   pharmacy and CMS is UnitedHealthcare as a plan sponsor

11   and also the PBM.

12         THE COURT:  Right, but doesn't that

13   happen on the services side too?  I'm just talking about

14   the difference between Medicare services like doctors

15   and hospitals and drug benefits, right.  We have a

16   person who's getting Medicare, they have both drug

17   benefits and services benefits.  I kind of thought you

18   suggested -- and maybe this is right, I just don't know

19   the answer -- that CMS, who is responsible for

20   administering Medicare overall, hires these sort of

21   independent, relatively independent or whatever,

22   UnitedHealthcare-level people to administer the drugs.

23         MR. LEVITT:  Yes.

24         THE COURT:  But that that same thing is

25   not happening with services, and I kind of thought it

1   was.

2                 MR. LEVITT:  No.

3                 THE COURT:  No.

4                 MR. LEVITT:  It is different, Judge.

5                 THE COURT:  Okay.

6                 MR. LEVITT:  So the relationship

7    between CMS and a PBM is very different than the

8    relationship between Medicare and a physician.

9                 THE COURT:  Okay.

10                MR. LEVITT:  A physician is merely

11   credentialed to be able to process a medical -- to treat

12   a Medicare beneficiary.  They don't have a complex

13   contract that is set out by the Social Security Act.

14   The relationship between CMS and the plan sponsor and

15   between a PBM is directed by federal law.

16                And so CMS enters into a contract with

17   the plan sponsor.  This is all set out by the Social

18   Security Act.  And the Social Security Act tells the

19   plan sponsor in this case UnitedHealth Group is one

20   example, plan sponsor.  The CMS, the federal rep tells

21   the plan sponsor you must do certain things by federal

22   law.  You must incorporate in the contract between CMS

23   and the plan sponsor certain terms and conditions.  And

24   the law goes on to establish under the Medicare program

25   a first-tier entity.

1              And so to answer Your Honor's question,

2      a PBM is a first-tier entity within the meaning of the

3      Social Security Act.  This, of course, is in our papers.

4      And the Social Security Act tells CMS that when you

5      enter into a contract with the plan sponsor to

6      administer healthcare benefits and pharmacy benefits,

7      you must put certain terms in that contract.

8              And the law goes on to say to the plan

9      sponsor, United, when you in turn enter into a contract

10     with a PBM -- for example, Optum -- you can't just do

11     whatever you want to do.  You are bound by the rule of

12     law, you're bound by the Social Security Act, and you

13     must include in that contract between Optum and the

14     PBM -- excuse me, United and the PBM Optum, you must

15     include certain terms and conditions.  Like, for

16     example, you have to comply with federal law.

17             The law goes on to say that Optum, you

18     are a first-tier entity.  When you enter into a contract

19     with a provider like a pharmacy, that provider is called

20     a downstream entity.  And you have to include in your

21     contract between Optum, the first-tier entity, and the

22     provider, the downstream entity, certain terms and

23     conditions, including that Optum will follow the law.

24             THE COURT:  Well, that's in every legal

25     provision.  That's really not going to get you very far,

1   right?  I mean, every time there's a government law or

2   government regulation, whether express or implicit, the

3   government is saying you have to follow the law.

4                    MR. LEVITT:  Well, here --

5                    THE COURT:  That doesn't turn them

6   into -- and we'll get into the motion to dismiss

7   arguments.  I want them to be laid out by the defendant,

8   but I'm just trying to understand the basis of your

9   claim.

10                   So I'm not sure that telling them you

11  must follow the law in order to participate in this

12  broader regulatory scheme has any real bearing on their

13  status vis-a-vis the federal government.

14                   MR. LEVITT:  Sure, but it does,

15  Your Honor.

16                   THE COURT:  Okay.

17                   MR. LEVITT:  And I think it's important

18  maybe if I take another one or two minutes just to try

19  to convince you of that, that important fact, because

20  this is not like a mere compliance-of-law section.

21  Every contract says, okay, you are -- we're entering

22  into a contract and everyone agrees we're going to

23  comply with the law.  This is different.

24                   In this case CMS is supposed to approve

25  the contracts that are entered into between Optum and

1    the plan sponsor, between Optum and the provider.  And

2    in this case there are some important laws.  There's

3    laws that relate to sort of, for example, the prompt pay

4    law.  This gets me into maybe another point, and that is

5    as follows, Judge:

6                  I want to -- and you said, you know,

7    you can feel free to give some color to the complaint.

8    And I want to --

9                  THE COURT:  Well, I do, I want you to

10   do that, but I definitely need you to walk me through

11   the claim so that I can understand what it is you're

12   alleging.

13                 MR. LEVITT:  Okay.

14                 THE COURT:  Okay.

15                 MR. LEVITT:  I will, Judge.  But I'd

16   first like to give this concept of some, the color and I

17   want to follow the concept of following the money and to

18   see this VAWD, what does VAWD do.

19                  So Optum wrote this letter to these

20   pharmacies, and 16,000 pharmacies in the United States

21   are in this Optum's pharmacy network.  And they said you

22   can no longer buy from the secondary wholesale market

23   from anyone who is not VAWD-accredited.  And so to be

24   clear, it is consistent with a myriad of federal laws

25   involving the supply chain --

1    THE COURT:  I'm sorry.  I want to be

2  really precise, because it matters.  They didn't mean

3  you can no longer buy from them like you'd be breaking

4  the law if you did that.

5    MR. LEVITT:  Sure.

6    THE COURT:  Isn't that what you --

7    MR. LEVITT:  It's even worse.

8    THE COURT:  What you mean is you won't

9  be reimbursed through Medicare if you choose to do that,

10  right?

11    MR. LEVITT:  Sure.  No.

12    THE COURT:  No?

13    MR. LEVITT:  What they said was it's a

14  little bit like what you just said, Judge.  It's if we

15  audit you and we find that that you were complying with

16  the law but you didn't comply with our rule that's not

17  law, VAWD is not the law, so we're clear about that.

18  VAWD prevents a wholesaler from buying from a pharmacy.

19  The law permits, federal law permits a wholesaler such

20  as the IAPW members to buy drugs from a pharmacy.

21    So Optum in terms of administering the

22  Medicare program has adopted a rule that is beyond the

23  law.  And to answer Your Honor's question, they don't at

24  the point of sale say, Hey, by the way, we're not going

25  to adjudicate this claim.  When I say "point of sale," I

1   mean when a pharmacy processes a drug claim to Optum,

2   Optum doesn't reject a claim.  Optum says, We reserve

3   the right later on after you dispense the drug to the

4   Medicare beneficiary, we reserve the right to come to

5   your pharmacy, ask you where you bought your drugs and

6   if you bought from a non-VAWD supplier, we're going to

7   recoup 100 percent of what we paid.

8               THE COURT:  Right.  But that's just on

9   you.  I'm just trying to understand the results of the

10  violation.  You say you have this new rule.  The rule is

11  you can't buy from -- what is the rule?

12              MR. LEVITT:  Non-VAWD.  The rule is you

13  can't buy from a wholesaler in the secondary

14  marketplace.

15              THE COURT:  And if you do that, what?

16              MR. LEVITT:  It's the ultimate penalty.

17              THE WITNESS:  No, if you do that,

18  what --

19              MR. LEVITT:  We will pay back

20  100 percent of the money you paid for.

21              THE COURT:  Okay.  But you understand

22  there are penalties that would mean you go out of

23  business.  You know, we are the law, we're saying you've

24  committed a criminal violation and we're bringing some

25  sort of action against you.

1          What you're saying is you will not be

2    reimbursed for the drugs that you sell through the

3    Medicare process if you choose to buy them from the

4    pharmacies in violation of the VAWD policy.

5          MR. LEVITT:  It's 80 percent of what

6    you said, Judge, but they do reimburse him.  The PBM,

7    Optum, the defendant's case, does reimburse the

8    pharmacies network.  But later they come back and they

9    audit and they take back the money out of the --

10          THE COURT:  You're not reimbursed.

11   There is a time lapse.  You think you're reimbursed and

12   oops, we're taking it back later.  I get that.

13          MR. LEVITT:  It's forfeiture.

14          THE COURT:  Understood.  Understood.

15   But I just want to be clear that the violation for the

16   rule is not necessarily or not even redounding to some

17   sort of criminal violation or, you know, meaning that it

18   is somewhat at least conceptually consistent with what

19   you say is the law, which is you can choose to buy from

20   the secondary, you know, market people or you can choose

21   to -- it just means you don't get reimbursed through

22   Medicare.

23          MR. LEVITT:  It means we recoup, they

24   will require a forfeiture of 100 percent of the

25   proceeds.

1          THE COURT:  Okay.

2          MR. LEVITT:  So just taking it there

3   for a moment, let's just stick with that statement.  If

4   Medicare, CMS, wanted to come up with a rule that says

5   to all pharmacies in the network, we're creating a new

6   rule.  If you, pharmacy, would like to buy from a

7   non-VAWD accredited wholesaler, go knock yourself out.

8   You can do it.  There's no criminal violation, we're not

9   going to terminate you from the network, we're just

10  going to take back 100 percent of the proceeds.

11          THE COURT:  No, we're not going to give

12  it in to you.  It's pretty important, right?  You will

13  not be reimbursed through Medicare for any purchases

14  that you make in this way.  And if we find out after the

15  fact that you have been reimbursed, we take it back.

16          MR. LEVITT:  Sure.  Let's say they want

17  to do that.

18          THE COURT:  Yes.

19          MR. LEVITT:  Let's say if they want to

20  say you will either not be reimbursed or if we pay you

21  and we find out you did it, we will take back

22  100 percent of the money, you'll forfeit the money.

23          THE COURT:  Right.

24          MR. LEVITT:  Let's make one thing very,

25  very clear.  No one has said that buying -- that a

1    wholesaler in the secondary marketplace buying from a

2    pharmacy violates the law.

3                    THE COURT:  I understand.

4                    MR. LEVITT:  No one says that.

5                    THE COURT:  I understand that.

6                    MR. LEVITT:  So let's say Medicare

7    said, We're coming up with a new rule.

8                    THE COURT:  Right.

9                    MR. LEVITT:  We will not compensate you

10   or we'll recoup the money later on.

11                   THE COURT:  Right.

12                   MR. LEVITT:  And they want to do that.

13   How will they go about making that rule?  Wouldn't they

14   have to follow the Administrative Procedure Act?

15   Wouldn't they have to come up with a proposed rule and

16   in the -- we live inside the rule of law.

17                   THE COURT:  Right.

18                   MR. LEVITT:  Medicare, CMS, HHS,

19   they're subject to the rule.

20                   THE COURT:  But they're subject to the

21   notice-and-comment requirement only insofar as they are

22   a government entity.  So explain to me, this gets at the

23   heart of your claims --

24                   MR. LEVITT:  Yes.

25                   THE COURT:  Are you claiming for the

1   purpose of Count I -- let's walk through the counts --

2   that OptumRx is a government entity for the purpose of

3   the application of the notice-and-comment provision, or

4   are you saying they're an agent -- there's a difference,

5   I think, maybe --

6                     MR. LEVITT:  Sure.

7                     THE COURT:  -- between being an agency

8   and being an agent.

9                     MR. LEVITT:  Absolutely.

10                    THE COURT:  So which are you claiming

11  or whatever?

12                    MR. LEVITT:  Optum is clearly not an

13  agency of the government.

14                    THE COURT:  Okay.

15                    MR. LEVITT:  But the Social Security

16  Act created HHS.

17                    THE COURT:  Right.

18                    MR. LEVITT:  It gave HHS the authority

19  to create CMS.

20                    THE COURT:  Right.

21                    MR. LEVITT:  CMS goes out, CMS doesn't

22  process any drug claims.

23                    THE COURT:  Understood.

24                    MR. LEVITT:  CMS hires agents to do so.

25  Those agents are duty-bound to follow the law.

1        THE COURT:  I'm sorry.  Is

2   UnitedHealthcare an agent under your -- because you got

3   one more layer here.  CMS, we agree, is an agency.

4        MR. LEVITT:  Yes.

5        THE COURT:  They are hiring

6   UnitedHealthcare, correct?

7        MR. LEVITT:  Yes.

8        THE COURT:  Is UnitedHealthcare an

9   agent?

10        MR. LEVITT:  Without a doubt

11   UnitedHealthcare is an agent of the federal government.

12   They administer the Medicare program.

13        THE COURT:  And then everybody -- under

14   your view, everybody, UnitedHealthcare hires to help

15   them also becomes an agent?

16        MR. LEVITT:  By law, absolutely.

17        THE COURT:  What law?

18        MR. LEVITT:  Okay.  The Social Security

19   Act creates -- they say that a plan sponsor, United,

20   plan sponsor, United is a plan sponsor under the Social

21   Security Act.  The law says that when United enters into

22   a contract with a PBM, they can't just hire anybody.

23        THE COURT:  I understand.  But what --

24   what was missing in a little bit of the discussion --

25   and this will come up, I think, on both sides -- is

1    agency law.  You're saying Optum is acting as an agent

2    in its role as an administrator of this program.  But

3    don't we have a body of law that tells us vis-a-vis the

4    restatement or whatever else who an agent is as a matter

5    of law?

6              What was weird to me is we're suddenly

7    talking about the stuff that Optum does as a matter of

8    fact, and that may well be so.  But what do we know

9    about what the law requires someone to do in order to be

10   a, quote/unquote, agent as a matter of law?  Do we know?

11             MR. LEVITT:  Well, the first part of it

12   is the Social Security Act absolutely requires certain

13   things of the agent.  It requires --

14             THE COURT:  I want to know are you an

15   agent?  What does it mean to be an agent?  Have we

16   opened the restatement and said, Here is the restatement

17   on agency.  In order to qualify as an agent, you have to

18   do these three things or four things or six things?  I

19   don't know because I haven't done it, and I didn't see

20   it in anybody's discussion.

21             MR. LEVITT:  We do have some law on it,

22   Judge, and if you allow me I'll just recite a couple of

23   those things.  They were in the papers, but it's in

24   direct response to your question.

25             There are examples of federal courts

1    agreeing that Aetna, for example, and Humana in this

2    role as a Medicare administrator are acting as agents of

3    the government.  So, for example, when Aetna and Humana

4    were acting in the case of *ManorCare Potomac v.*

5    *Understein*, 2002 Westlaw case in the District of

6    Columbia in Maryland, MD -- excuse me, the Middle

7    District of Florida in 2002, Aetna argued that as a

8    Medicare benefit provider under contract with the

9    government that they were a part of the United States

10   Department of Health and Human Services and they

11   qualified Aetna as a person acting under an agency or

12   officer of the United States for purposes of the Federal

13   Officer Removal statute.

14            And so in that case Aetna and in

15   another case, Humana, were able to remove to federal

16   Court a state court action because they were saying

17   we're administering the federal Medicare program.

18   Therefore we're acting as an agent of the government.

19   So that's clear law in Aetna and Humana.

20            There also -- there is a body of law,

21   Judge, that we have cited, the *Gideon* test, which

22   determines whether a person or entity acting as an agent

23   of the government such that they are subject to the rule

24   of law, the Administrative Procedure Act.  In the *Gideon*

25   case, it was not in the context of the federal

24

healthcare program, I do acknowledge that.  But the

*Gideon* case pretty clear lays out a few factors that

will assist a court in understanding when a person or

entity is acting as an agent of the government.  And the

test is not incredibly difficult for us to establish in

this case.

          In that case there was a United States

trustee in the bankruptcy court, and obviously a United

States trustee is not, as Your Honor knows, is not an

actual officer of the court.  It's not one of the

employees that sit in the courtroom.  It's a private

attorney that is retained by the bankruptcy court to act

as a trustee.  So there's a private actor in a sense.

          THE COURT:  Yes.

          MR. LEVITT:  A guy like me or a gal

like anybody else.  And in that case, the United States

in the *Gideon* case, the United States trustee acted

outside the boundary of the law.  In this case the

parallel is we are saying very unequivocally that Optum

is acting outside the benefit of the law.  They made a

super law, which I want to get into the money side in a

moment.

          But in *Gideon*, the Court found -- in

*Gideon* the United States trustee said I'm not a

governmental actor.  I'm just a guy who as a lawyer was

1    appointed as a trustee.  The Court said no, you are

2    appointed to administer a part of this bankruptcy estate

3    and you are bound by the --

4                    THE COURT:  Here is the problem.  This

5    is why I'm really worried about the floating principles

6    of agency that are driving your case.  Because as you

7    suggest and as we all know and understand, the Medicare

8    and health benefits writ large system in the United

9    States is a very complicated one that is not entirely

10   run, administered, et cetera, by the government itself.

11   I would posit to guess that there are thousands, maybe

12   even millions of individuals who are acting in the

13   context of the federal healthcare scheme that we

14   currently have helping to administer the benefits in the

15   programs.

16                   So I don't know that it's enough just

17   to say you're a part of Medicare, right, that gets you

18   into agency for the purpose of imputing your own acts

19   and decisions to the federal government for the purpose

20   of the APA or anything else.  I've really got to

21   understand when a person who is making a decision in the

22   context of the Medicare scheme qualifies as an agent in

23   order to really appreciate your argument here, and I

24   worry that we haven't pinned it down with a bankruptcy

25   case that has nothing to do with Medicare, with, you

1    know, just not even looking at the restatement about

2    agency.  I don't really know that we've gotten there.

3                    MR. LEVITT:  Sure.

4                    THE COURT:  But let me just make sure I

5    understand your claims, because I want to get to the

6    dismissal points and so that you can respond directly to

7    those.  All right.

8                    I understand Count I being an APA

9    claim.  I'm trying to figure out whether it is purely a

10   notice-and-comment violation that you're claiming here.

11   At some point in the reply you come back with, Well,

12   this is about a failure to act.  That's actually a

13   different provision of the APA that didn't seem to be

14   claimed in your complaint.

15                    So what is the violation that you are

16   alleging in your complaint related to the APA?

17                    MR. LEVITT:  I think there are three,

18   Judge.

19                    THE COURT:  Okay.

20                    MR. LEVITT:  One is the failure to act.

21   So in our judgment --

22                    THE COURT:  And you can point me to the

23   complaint.  That would be helpful.  I mean, you can't

24   tell me new claims now in this context, right.  They

25   have to be in the complaint.

1       MR. LEVITT:  I don't believe that it

2  hasn't been pled with particularity, but it would be

3  difficult, Judge, for me to just point out right now

4  with my, over there --

5       THE COURT:  All right.

6       MR. LEVITT:  If there's any

7  post-hearing submissions, I could point directly --

8       THE COURT:  So you say Count I, which

9  I'm looking at now, has within it three different APA

10  violations.  One is the failure to act.  The failure to

11  act how?

12       MR. LEVITT:  There's a couple of

13  different ways to failure to act.  One is as we do cite

14  I think directly in the complaint, the Drug Quality

15  Security Act, DQSA, required the CMS to take action, to

16  make rules relating to the drug supply.  And so that's

17  very clearly laid out in our brief and I believe in the

18  complaint.  That was a failure to act.  But I think

19  there's --

20       THE COURT:  I'm sorry.  So you're

21  saying when they heard that OptumRx was doing this, they

22  needed to come in?

23       MR. LEVITT:  No.  I'm sorry, Different,

24  Judge.  When Congress passed the Drug Quality Security

25  Act, Congress required HHS to come up with regulations

1  that would flesh out the law.  That was within two years

2  of, I believe, 2013, and that didn't happen.

3           What we're talking about here in this

4  case is Optum creating law about the drug supply chain

5  that relates to Medicare.  So there's -- I would say

6  there's two different failures to act.  One failure to

7  act is Congress said You must act.  You must come up

8  with the rules and regulations about the drug supply

9  chain.

10           THE COURT:  Right.  But you know the

11  defendant is going to say who are you to police that,

12  right?  That's like a standing problem, isn't it?

13           MR. LEVITT:  The Administrative

14  Procedures Act, I think, is the vehicle by which we can

15  challenge that.  Because here we have --

16           THE COURT:  It has to pertain to you in

17  a direct way, doesn't it?  I mean --

18           MR. LEVITT:  How does it not?  The Drug

19  Quality Security Act has Titles I and II.

20           THE COURT:  Right.

21           MR. LEVITT:  Has titles that talk --

22  the whole law is about the supply chain of drugs.

23           THE COURT:  Right.

24           MR. LEVITT:  My clients are in that

25  supply chain.  These laws that HHS was supposed to --

1   the regulations that HHS was cognizant, you come up with

2   these regulations, those regulations impact the issues

3   directly at play here.

4                    THE COURT:  So they came up with no

5   regulations?

6                    MR. LEVITT:  Correct.  They failed to

7   act.

8                    THE COURT:  Okay.

9                    MR. LEVITT:  Another failure to act,

10  which is in my judgment equally as important, it goes to

11  your, if you call it an agency principle, you can call

12  it an agency principle and I do want to get -- I hope

13  that you'll indulge me to answer some questions.  You

14  said there could be millions.  I want to answer that,

15  millions of folks that could be deemed to be an agency.

16                   If Your Honor makes a decision that

17  says, Yeah, we're agents, I think that you have a

18  reasonable concern that this could have broad

19  implications beyond the courtroom, beyond the parties

20  here, and I want to address that.

21                   But in addition to the failure to act,

22  which Congress said Go make rules and they didn't make

23  those rules and those rules are directly relevant to the

24  relationship between the parties here, they also failed

25  to act -- they have a contract, HHS, CMS, has a contract

1    with Optum.  They have a contract with United, a

2    contract with Optum.  And Optum is supposed to follow

3    the law and HHS, CMS, is supposed to ensure that their

4    flock is following the law.  And here their flock,

5    including Optum, is just making its own rules.

6                    THE COURT:  All right.  So once again,

7    I'm just trying to understand, your members are or are

8    not in privity with any of the parties of the contract?

9    In other words, you're trying to enforce a violation of

10   a contractual agreement that you appear to have nothing

11   to do with directly.  You're not in that contractual

12   arrangement.

13                    MR. LEVITT:  My clients are not

14   providers in Medicare.  They sell drugs to providers.

15                    THE COURT:  Right.  So you're seeking

16   here pursuant to your second failure-to-act allegation

17   to enforce the, what you see as a contractual

18   violation --

19                    MR. LEVITT:  Sure.  CMS --

20                    THE COURT:  -- between the other

21   parties who have contracted?

22                    MR. LEVITT:  CMS has a contract with

23   Optum.

24                    THE COURT:  Right.

25                    MR. LEVITT:  That contract says that

1    Optum has to follow the law.  And I would like to get

2    into some of the -- I'm not going to detail laws, but

3    there are a myriad of drug supply chain laws that cover

4    every aspect of the drug --

5                    THE COURT:  I understand.  I'm just

6    trying to understand your stake in that.  I know it

7    affects you writ large, but you're not a party to the

8    contract that you're seeking.

9                    MR. LEVITT:  The stake that the

10   Association of Independent Pharmaceutical Wholesalers

11   has in this is that they are the secondary marketplace.

12   So we are clear, VAWD destroys -- if somebody is,

13   says --

14                    THE COURT:  No, I don't want to go back

15   because I'm interested in time.  So we have failure to

16   act.  We have two failure-to-act claims.  What other APA

17   violations are there?

18                    MR. LEVITT:  In this case Optum, if

19   they're acting as a contracted party or an agent, either

20   one, I think that they're either -- they're non-mutually

21   exclusive.  If they are acting either one, and if CMS --

22                    THE COURT:  I'm sorry, either one of

23   what?

24                    MR. LEVITT:  Either acting as an agent

25   or as a contracted party with CMS.

1          THE COURT:  Do they have a contract

2  directly with CMS?

3          MR. LEVITT:  Yes, Optum has a

4  contract --

5          THE COURT:  Yes, Optum has a contract

6  but not your members?

7          MR. LEVITT:  Correct.

8          THE COURT:  Okay.  So Optum -- sorry,

9  so Optum has a contract with CMS.  And if they're acting

10  either as a contractual, pursuant to that relationship,

11  or I'm sorry --

12          MR. LEVITT:  Or as an agent.

13          THE COURT:  Or an agent.

14          MR. LEVITT:  I think Your Honor is

15  concerned about the nomenclature, just putting a stamp

16  on saying you're an agent of the government.  I get

17  that.

18          THE COURT:  All right.  So either

19  contractual or agent.  And what's the violation?  They

20  were supposed to do what that they didn't do?

21          MR. LEVITT:  To be clear, if CMS wanted

22  to come up with a rule, you cannot, a wholesaler may not

23  buy from a pharmacy.  They have to go through the notice

24  period.

25          THE COURT:  Okay.

1           MR. LEVITT:  And rule-making period

2    and, by the way, they couldn't do it because it is

3    inconsistent with a law of Congress.  HHS and CMS are

4    not permitted to come up with a law -- excuse me, a

5    rule, a regulation -- obviously agencies created

6    regulations.

7           THE COURT:  You're getting into

8    substance.  I just want to understand, the second piece

9    is a notice-and-comment violation.

10          MR. LEVITT:  Yes.  But --

11          THE COURT:  Under --

12          MR. LEVITT:  What I'm saying is under

13   the Administrative Procedures Act if CMS wanted to

14   create a rule, wholesaler, you may not buy from a

15   pharmacy --

16          THE COURT:  Right.

17          MR. LEVITT:  -- they would have to go

18   through the notice and comment.  There's no doubt about

19   that.

20          THE COURT:  Understood.  So the second

21   violation is a notice-and-comment violation.  What's the

22   third basis by which you are claiming there is a

23   violation of the APA?

24          MR. LEVITT:  They're allowing their

25   agent to come up with a rule that they couldn't

1    otherwise come up with.  So CMS couldn't directly create

2    a law that you can't buy from a pharmacy.

3                    THE COURT:  Right.

4                    MR. LEVITT:  But they are allowing, in

5    the administration of the Medicare program, they are

6    allowing their contracted party, Optum --

7                    THE COURT:  That's not an APA

8    violation.  So the APA has certain ways you violate it,

9    right?  Arbitrary and capricious is one of them.  There

10   is a sort of unreasonable delay, failure-to-act kind of

11   piece.  Notice and comment is one of them.  I'm trying

12   to understand the third theory.  I heard the first two,

13   they're in the APA.  What is the third?  Are they -- are

14   you saying arbitrary and capricious or something?

15                   MR. LEVITT:  It is absolutely arbitrary

16   and capricious for Optum, the contracted party or agent,

17   to come up with this rule and this rule that is

18   inconsistent with federal law.

19                   THE COURT:  Okay.  All right.  So

20   that's APA, which is Count I.

21                   Help me to understand Count II.  I

22   thought I had my mind around it, and then came the reply

23   brief, the opposition and the reply briefs which

24   suggested that Count II, the declaratory judgment was

25   really a variation of the APA or the remedy for the APA

1   violation.  Help me.

2                    MR. LEVITT:  The only thing that we're

3   making a point there about the APA is that the APA has a

4   privity of action, and a declaratory judgment allows the

5   APA to be the vehicle for that privity of action.

6                    THE COURT:  Why do you need it?  You

7   can get a declaratory judgment under the APA.  Is the

8   violation that you're seeking to have declared the

9   violation of the APA that you just talked about?

10                   MR. LEVITT:  It's a violation of the

11  law, Judge.  It's a violation -- in our judgment the law

12  is very clear on the supply chain.  And Optum as

13  extracted party or agent of the government is creating a

14  law that is inconsistent with that law.  And we are

15  seeking a declaration that HHS not permit their agent to

16  do that, and we're seeking a declaration to prevent

17  Optum from doing so.

18                   THE COURT:  And is that connected to

19  the APA violation that you just, or not?  In other

20  words, I don't know that you have sort of a

21  free-floating claim that you can bring a Declaratory

22  Judgment Act claim whenever you think the government is

23  violating the law.

24                   MR. LEVITT:  I think the law --

25                   THE COURT:  You have to have a cause of

1     action in order to be able to do that.  And it's unclear

2     to me where the cause of action is.  If you're saying

3     the cause of action is arising under the APA, which is

4     kind of what I thought you were saying at one point,

5     then you don't need this separate floating thing.  You

6     have the APA.  So what is the separate basis for your

7     declaratory -- cause of action?

8                    MR. LEVITT:  I'm not sure there is one,

9     Judge.

10                    THE COURT:  Okay.  So we think Count II

11    is really not a thing.

12                    MR. LEVITT:  Our point is there is case

13    law that supports it that you can support a declaratory

14    action with a predicate act being a violation of the

15    APA.

16                    THE COURT:  All right.  I will look

17    into that.

18                    Count III -- I just need to get through

19    them because I want to understand the motions, which is

20    really the point of being here.  Count III is the

21    Regulatory Flexibility Act.  Does that have its own

22    cause of action that you can enforce?  In other words,

23    does that statute permit a person like your members to

24    bring a lawsuit to enforce a violation of the statute?

25                    MR. LEVITT:  Judge, there is express

1   privity right of action and implied privity right of

2   action.

3                    THE COURT:  Okay.

4                    MR. LEVITT:  This law of which is Count

5   III --

6                    THE COURT:  Yes.

7                    MR. LEVITT:  -- it does not -- some

8   laws state specifically, some statutes state there is no

9   privity right of action under this law.  Some laws are

10  silent.  This law is silent on the issue.  And we feel

11  that it is strongly implied.

12                   THE COURT:  Okay.  So fine.

13                   Now, IV, V and VI are against Optum

14  only.  Is that right?

15                   MR. LEVITT:  Yes.

16                   THE COURT:  Not the federal defendants.

17  And they arise under California law.

18                   MR. LEVITT:  Yes, Your Honor.

19                   THE COURT:  But you're here in this

20  court basically because of the federal defendants,

21  right?  I mean, this really wouldn't be the right venue

22  if you just had those claims by themselves.

23                   MR. LEVITT:  The right venue, I think

24  we have personal jurisdiction over the defendant for

25  diversity and also subject matter jurisdiction in

1   federal court.

2              THE COURT:  Optum in California?  I

3   mean, sorry, Optum here?

4              MR. LEVITT:  Yes, absolutely.

5   Absolutely.

6              THE COURT:  But venue is a slightly

7   different consideration than personal jurisdiction.  In

8   other words --

9              MR. LEVITT:  Sure.

10             THE COURT:  Let's posit, you know, the

11  federal claims are all gone and we just have IV, V and

12  VI.  Wouldn't this be better suited to the -- I don't

13  know, is it the Southern District of California?  I

14  don't know which district, but to talk about whether or

15  not there are adequate allegations of fact under

16  California law, it seems to me that would be a better

17  venue to try to, or to consider the claims that you're

18  bringing against Optum under California law; right?

19             MR. LEVITT:  I think the venue --

20  obviously if personal jurisdiction is conceded and

21  subject matter jurisdiction is conceded in federal court

22  and we go to the convenience analysis for the parties

23  for venue selection --

24             THE COURT:  Yes.

25             MR. LEVITT:  Ms. Tanner is in the

1    courtroom.  She's from Optum.  She's here.  There's no

2    requirement that she be here.  She's not testifying

3    today.  She's here.  And Optum is one of the largest

4    companies in the country.

5                   THE COURT:  Where are they

6    headquartered, do you know?

7                   MR. LEVITT:  They have multiple

8    headquarters.  One is certainly in California.  I

9    believe they have one or two other headquarters.  But

10   they certainly, if you compare the relative

11   inconvenience of the parties, given that subject matter

12   jurisdiction and personal jurisdiction are satisfied in

13   D.C. District Court, if you compare the relative

14   convenience of the parties, certainly Optum is better

15   able to fly, for example, Ms. Tanner here again, if

16   necessary.  In comparison to the secondary wholesale

17   market, they are a small player, Judge.

18                   THE COURT:  All right.  I realize that

19   was not briefed.  I was just wondering, you know.  I

20   sometimes am reluctant to be the one to opine on other

21   jurisdictions' law.  I know a lot about D.C. law,

22   obviously, but to the extent you're asking me whether

23   under California's common law tortious interference, you

24   know, who am I to say.  So that just occurred to me as I

25   was looking at this.

40

1          All right.  I think I understand the

2  claims.  You will have a chance to respond and you can

3  weave in your color about the money and everything else.

4  All right?

5          MR. LEVITT:  Okay, Judge.

6          THE COURT:  Okay.  Thank you.  Let me

7  have defense counsel.

8          So we heard about the claims and now

9  you can tell me the various reasons why you think they

10  need to be dismissed.

11          MR. ASMUS:  And, Your Honor, it may --

12  and sorry, Jason Asmus for OptumRx.

13          THE COURT:  Yes.

14          MR. ASMUS:  It may make sense for me to

15  address sort of procedural and standing issues and then

16  get into what Plaintiff's counsel was talking about,

17  we'll let the federal government get into the issues

18  about federal agency law and those sorts of things, and

19  then I can come back on the three tort claims.

20          THE COURT:  That's fine.

21          MR. ASMUS:  But I want to start with

22  just a little bit of background as to the players and as

23  to VAWD.

24          Optum is a pharmacy benefit manager.

25  It manages prescription benefit -- prescription drug

1    benefit plans, and it contracts with pharmacies pursuant

2    to a provider manual, which we submitted to the Court as

3    part of the motion to dismiss.

4                    As Plaintiff's counsel said, it's not a

5    Medicare Part D plan sponsor.  And it is not a

6    government agency.  And I heard that was conceded, which

7    it wasn't clear to me in the briefing that it actually

8    was conceded.  We're not an agency of the government.  I

9    guess it's an agent issue, which I'll get into in a

10   minute.

11                   We as Optum as part of its contract

12   imposed this private contractual requirement that in

13   order to receive reimbursement for prescription drugs

14   that are dispensed to its members, that those drugs be

15   purchased from a VAWD-accredited wholesaler.

16                   THE COURT:  So first can you tell me

17   who are -- you did talk about members, and I didn't want

18   to be confused.  Optum has members, or what does it

19   have?

20                   MR. ASMUS:  It contracts with the

21   pharmacies who dispense drugs to covered participants,

22   members through the UnitedHealth organization.

23                   THE COURT:  Okay.  So it's contracting

24   with the people who are giving the drugs to individuals

25   who are covered by Medicare Part D and are members of

1    the UnitedHealthcare network; is that right?

2                    MR. ASMUS:  Yes, in essence, yes.

3                    THE COURT:  In essence, okay.

4                    MR. ASMUS:  So what is VAWD?  VAWD is

5    this accreditation standard by NABP, which is an

6    impartial third-party nonprofit national association of

7    various state and territory boards of pharmacy.

8                    And NABP submitted an amicus brief for

9    the Court to read, and I'm not going to repeat what is

10   in there, but the very purpose of the VAWD accreditation

11   requirement is to protect the public from drugs that

12   have been contaminated, counterfeited or diverted.  It's

13   a public safety purpose, which is important.

14                   Three additional facts which I think

15   add some additional color as it relates to the VAWD

16   accreditation standard.  The accreditation standard by

17   NABP, by the way, is different than the private

18   contractual requirement that Optum has with its

19   participating pharmacies.  Three facts --

20                   THE COURT:  Can I just ask a question?

21                   MR. ASMUS:  Yes.

22                   THE COURT:  Is that relationship or the

23   terms of the private contractual agreement it has with

24   the pharmacies governed in any way by federal law?

25   Mr. Levitt suggested that Optum doesn't just pull these

43

1    contract terms with its pharmacies out of the air, that

2    there's some obligation to put in certain things or not

3    have certain things, he says, or whatever.  Is he right

4    about that?

5              MR. ASMUS:  There are contractual terms

6    that are required to be in there, which are in there.

7    But it's a very lengthy and, frankly, dense, call it

8    provider manual which sets out all the terms.

9              The one thing that we didn't touch on

10   earlier today and it relates to the contract is the

11   noninterference rule which we believe as part of Count

12   II, which says that the Secretary of HHS shall not

13   interfere in the negotiations between, in this instance,

14   the pharmacy or the PBM, Optum, and its participating

15   pharmacies.  And that's -- it's pursuant to that

16   noninterference that Optum is allowed and entitled to

17   impose as a contractual requirement that its

18   participating pharmacies not purchase drugs from non --

19             THE COURT:  I see.  So even though

20   there are some contractual terms that the law requires,

21   Optum can negotiate with its individual pharmacies'

22   other terms?

23             MR. ASMUS:  It can, and it statutorily

24   is supposed to, and statutorily the government is not is

25   to interfere so as to promote competition.

44

1          THE COURT:  All right.

2          MR. ASMUS:  So let me -- with that,

3    Your Honor, let me spend just one minute -- that's a

4    lie, it's never only one minute.  There are two

5    procedural issues with the filing of the amended

6    complaint.

7          THE COURT:  All right.

8          MR. ASMUS:  What we've called old AIPW,

9    which originally commenced this lawsuit and mid-suit

10   dissolved, and then new AIPW was organized after the

11   initial motion to dismiss and then just filed an amended

12   complaint without a motion.  That action implicates both

13   Rule 15(d) and Rule 25(c).  15(d) is supplementation of

14   pleadings, and the purpose of supplementation is if

15   there is a post-filing occurrence which requires

16   supplementation, that's on motion.

17         THE COURT:  All right.  I got to tell

18   you I have no idea what you're talking about, and let me

19   tell you why.

20         MR. ASMUS:  Okay.

21         THE COURT:  All right.  Because parties

22   are substituted -- and I'm assuming for a second that

23   we're talking about a substitution of parties -- all the

24   time by amended -- by amendment.  It has never in my

25   experience been deemed the kind of transaction event or

1    occurrence that triggers some sort of 15(d) supplement

2    procedure.  So do you have a case that indicates that

3    what you're talking about is a change in the parties and

4    not the claims, not some different thing that has

5    happened, that 15(d) is actually triggered?

6              MR. ASMUS:  We did not cite a case,

7    Your Honor.  We simply relied on the text of the rule

8    which talks about, as you said, setting out a

9    transaction or occurrence that happened since the date

10   of the pleadings sought to be supplemented.

11             Even if, Your Honor, we set aside the

12   whole issue about whether there's a right to amendment

13   as a matter of right, which, by the way, it's an

14   interesting issue if we're going to analyze this as a

15   15(a) amendment as a matter of right when the amendment

16   is the initial plaintiff dissolved and as we briefed in

17   our opening motion to dismiss lost the capacity to sue

18   because of operation of the --

19             THE COURT:  Yes.  So therein lies the

20   second problem with your argument, and this implicates

21   your Rule 25 issue.

22             MR. ASMUS:  Okay.

23             THE COURT:  I don't understand why in a

24   situation like this in which we have an association who

25   is not claiming anything on its own behalf and is, in

1   fact, bringing this lawsuit to further the interests of

2   its members, why you think the party has been

3   substituted.

4            So here is my hypothetical:  All 25 or

5   22 or whatever of the members on Day 1 say We would like

6   to bring a lawsuit and we have a caption with 22 people

7   or 22 different companies on it.  And then at some point

8   in the context of the lawsuit they say, You know what,

9   this is getting to be too much trouble.  We can't figure

10  out what attorney is the lead, it's a disaster.  We need

11  to just have one entity that is taking this over and

12  serving on our behalf as the entity that is litigating

13  this lawsuit.

14           I don't see anything wrong with them --

15  it's not really even a substitution with them saying,

16  Your Honor, here is what we'd like to do.  We've been

17  calling ourselves 22 names, but from here on we have

18  formed an association and the association is not

19  claiming any interests in this lawsuit in its own right,

20  but it is, as it does in this case, seeking to advance

21  or pursue our interests.  We've given it our proxy to

22  serve as plaintiff.

23           I don't see that you've substituted

24  parties there.  You still have the plaintiffs'

25  interests, all 22 were in at the beginning, all 22

1   vis-a-vis the association are in today.  So why is

2   this -- you're assuming that we're actually changing

3   parties between new and old or whatever, and I don't see

4   that that's necessarily the case.

5               MR. ASMUS:  And maybe Your Honor is

6   thinking about it in terms of the representative claim,

7   because I completely agree with you that AIPW, old or

8   new, is not asserting claims on its own behalf.  It's

9   asserting claims on behalf of its purported members.

10              THE COURT:  And they were always the

11  same.  They're not a different plaintiff, right?  The

12  members were always there, both old and new.

13              MR. ASMUS:  Yes, so it's pled.  The

14  members of the entity were not identified in connection

15  with the initial complaint.  They were only identified

16  after the dissolution, after the formation, and --

17              THE COURT:  That's fine.  But do you

18  have any reason to believe that there are different

19  members today than there were before?

20              MR. ASMUS:  We do not, Your Honor.

21  It's pled in the complaint.

22              THE COURT:  Okay.

23              MR. ASMUS:  So again, ours is based

24  on -- our argument as to Rule 15 and Rule 25 is simply

25  based on the text of the rules which we read to require

1    at least a motion to set out how new AIPW acquired the

2    claim that it's seeking to --

3                    THE COURT:  But they didn't acquire the

4    claim.  My argument in response to you -- and I

5    appreciate that you may not have thought of it in this

6    way -- is do we really have a new claim?  Do we really

7    have a claim that has changed in any respect when the

8    claim or the interest has always been with the members

9    of this association, whether they call themselves

10   whatever before or this today, the interest has never

11   changed; right?

12                    MR. ASMUS:  It certainly is the same

13   claim.  And as to that question, the only thing I can

14   point to Your Honor is Paragraph 2 where it says --

15                    THE COURT:  Two of what, I'm sorry?

16                    MR. ASMUS:  I'm sorry, of the amended

17   complaint --

18                    THE COURT:  Yes.

19                    MR. ASMUS:  -- where it says, in

20   essence new AIPW "assumed all assets and liabilities of

21   the plaintiff" -- which I think means old AIPW --

22   "including the interest in the instant litigation and

23   continues this litigation as the transferee of the

24   interest."

25                    That's where I got the notion of a

1    transfer of interest, and we, our position was in

2    reading the rules was that if the interest -- in other

3    words, the claims were transferred from this dissolved

4    entity to a newly created entity for the purpose of

5    pursuing claims, that's a situation where it was a

6    substitution.

7                    THE COURT:  I understand.

8                    MR. ASMUS:  I'll move on then to my

9    point on standing.

10                    THE COURT:  Okay.

11                    MR. ASMUS:  So we have moved as to both

12    lack of constitutional standing and as to the absence of

13    prudential standing, and there are two reasons for each.

14    And in our briefing we started the standing discussion

15    by citing a *LaBotz* case to simply point out and it's

16    sort of a precursor.  I'm sorry, it's sort of together

17    with the issue of the supplementation or amendment in

18    substitution.  But standing is to be determined at the

19    commencement of the lawsuit.  We simply note that new

20    AIPW didn't exist at the time of the lawsuit.  There's

21    an allegation --

22                    THE COURT:  But they're not pressing

23    their own interests, right?

24                    MR. ASMUS:  Yes.

25                    THE COURT:  They're pressing the

1   members' interest if members existed.

2                     MR. ASMUS:  According to what's put in

3   the complaint, yes, Your Honor.  So that was a point

4   that we made.  It's not one of the two *Hunt* factors for

5   constitutional association standing.

6                     THE COURT:  What are the two *Hunt*

7   factors?

8                     MR. ASMUS:  You have two *Hunt* factors

9   at issue, Your Honor:  Individual participation of the

10  members is absolutely required in this case, because

11  money damages are sought against OptumRx.

12                    THE COURT:  Not in every claim?

13                    MR. ASMUS:  In every claim.

14                    THE COURT:  Not in the Declaratory

15  Judgment Act claim.

16                    MR. ASMUS:  Including the Declaratory

17  Judgment Act claim.

18                    THE COURT:  I know they say that, but

19  that's not a thing.  So assuming that they're actually

20  asking for a declaratory judgment, full stop --

21                    MR. ASMUS:  Yes.

22                    THE COURT:  -- would you need the

23  individual members?

24                    MR. ASMUS:  Yes.

25                    THE COURT:  Because?

1          MR. ASMUS:  Three cases I'll cite you

2     to, Your Honor.

3               THE COURT:  Yes.

4          MR. ASMUS:  Because the declaratory

5     judgment could be a precursor to a damage claim.  And

6     here it's pled in connection with the damages claim.

7     *Long-term Care Pharmacy Alliance*, a case from this

8     District in 2007, 498 F. Supp. 2d 187.  *Air Transport*

9     *Association of America v. Reno*, another case from this

10    District, 1996, 80 F.3d 477.  And then a D.C. Circuit

11    case from 1985, *Telecommunications Research and Action*

12    *Center v. Allnet*, 806 Fed 2d 1093.

13               All three of those claims involved

14    declaratory judgment claims and the Court held yeah,

15    it's a declaratory judgment claim but it also, if the

16    declaratory judgment is issued, it will bring with it a

17    claim for damages.  And because of that, individual

18    participation of the members is required.

19               THE COURT:  How is it necessarily that

20    the -- I'm still working out what the declaratory

21    judgment claim in this case is.  But assuming that it is

22    Court, we want you to tell OptumRx and the federal

23    defendants to stop violating the law, full stop, how

24    does that carry with it the ability to get damages?

25               MR. ASMUS:  So what it will be,

1    Your Honor, it's a matter of chronology.  So the private

2    contractual requirement came into existence over a year

3    ago.  And so if it's determined and declared that that

4    was wrongful, as pled in the complaint now there will

5    inevitably be a claim --

6              THE COURT:  But wouldn't they have to

7    bring a separate claim for that, and at that point you

8    say you can't do it as an association on behalf of -- I

9    mean, in other words, I get it, but they wouldn't be

10   able to claim damages.  If you assume right now that we

11   had our complaint and the only count was declaratory

12   judgment, everything we've said in here is a violation

13   of the law, right, and they say nothing about damages, I

14   don't know that that complaint would be sufficient to

15   entitle them to damages based on the declaration that I

16   made.  They would have to make some other claim for

17   damages, and at that point I suppose they could bring in

18   their members, or you would argue you have no standing

19   to make that damages claim at that point.

20             I just don't understand how they have

21   no standing for, on the basis that individual members

22   are necessary to make a declaratory judgment.

23             MR. ASMUS:  And all I can say,

24   Your Honor, two points in response to that question.

25   Those were the cases --

1          THE COURT:  I will look at them, yes.

2          MR. ASMUS:  And that Court recognized,

3    I think, as I read them yesterday, that what you say is

4    probably true, that there would have to be another

5    claim.  But the mere fact that the declaration would

6    lead to a damages claim or even a potential of a damages

7    claim, the courts in all three of those cases found that

8    it required the participation of the individual members

9    and therefore there was no standing found.

10         THE COURT:  All right.  That's the

11   first *Hunt* factor.  You say there are two?

12         MR. ASMUS:  Two at issue, Your Honor.

13   The other factor is the germaneness requirement.

14   Recognizing that the case law says that it's --

15   ordinarily it should be a relatively low threshold to

16   achieve.  The case that we would point the Court to is

17   the *Washington Legal Foundation v. Leavitt* case.

18   Germaneness prong, Your Honor, is essentially a

19   gatekeeping function.  This is a quote from the

20   Washington Foundation, Legal Foundation case.  "The

21   germaneness prong ensures a modicum of concrete

22   adverseness by reconciling membership concerns and

23   litigation topics by preventing associations from being

24   law firms with standing."

25              In that case a legal foundation was the

1    association pursuing claims.  They were challenging some

2    CMS guidelines.  The Court in that case found that this

3    was --

4                    THE COURT:  What was the problem, that

5    they didn't have real members with real interests?  They

6    were just a law firm?

7                    MR. ASMUS:  They had real members with

8    real interests.  What the Court actually said in that

9    case is, Well, yeah, but you didn't really have your

10   members until after you brought the suit.  They talked

11   about the three members that were at issue.

12                   THE COURT:  Yeah.

13                   MR. ASMUS:  There's an analogy here,

14   Your Honor.  We think that that case is apposite to the

15   facts here.  When you look at the chronology of what

16   happened here with old AIPW being formed on November 2,

17   two days later filing suit, dissolving, a new entity

18   being incorporated, continuing the suit.  And so like

19   the Legal Foundation of Leavitt, we think that new AIPW

20   is similar and the germaneness requirement was found to

21   not be satisfied there.

22                   THE COURT:  All right.  I will look at

23   that case as well.  I would have to say conceptually I

24   don't quite think that it makes sense to say that you

25   can't have an association that forms for the purpose of

1   pursuing this common interest of your members.  It

2   doesn't seem -- I don't know why that would make a

3   difference that, you know, we were a long-existing

4   organization of members trying to pursue our interests

5   and along came this issue and we pursued it in

6   litigation.  I don't know why that would have to be the

7   case as opposed to even the scenario that I posited a

8   few minutes ago, where individuals working together and

9   then we suddenly say You know what, let's form an

10  organization in order to pursue this interest legally.

11  I don't know that it would matter as long as the purpose

12  of the organization is to further the interests of the

13  members and they're doing it through this lawsuit.  It

14  doesn't seem to me, at least conceptually, that it would

15  make a difference.  But I will look at your case.

16              MR. ASMUS:  I can't point you to a case

17  where that timing aspect had a difference except to say

18  I didn't find a case that had the timing aspects that

19  this case has.  The other ones were long-standing.  And

20  I want to backtrack for one second.

21              As to the individual participation, we

22  didn't talk about, and I understand the Court

23  understands it, but there are three tort claims here,

24  each of which seek damages.  Those require individual

25  participation.

1          THE COURT:  Right.  And I will ask

2     Plaintiff's counsel how the association can seek to

3     pursue a tort claim for damages in this way without

4     individual member participation.

5          MR. ASMUS:  And the answer at least in

6     the briefing, Your Honor, was well, our primary relief

7     is we want a declaration and an injunction against it.

8     And secondarily, or we're preserving the right to seek

9     damages.  The fact of the matter is they're seeking

10    damages that are pled in the complaint, and that

11    precludes standing.

12          Prudential standing, very quickly --

13          THE COURT:  Let me potentially save you

14    the trouble.  What I don't understand -- and I do

15    recognize that there's some case law that suggests that

16    prudential standing is applicable here.  But at least in

17    my *Fiberlight* decision, which you have cited, we weren't

18    talking about associational standing.  We were talking

19    about third-party standing.  And I don't think that the

20    two are the same for the purpose of this prudential

21    standing consideration.

22          In other words, I'm not sure that an

23    association, to the extent it meets the *Hunt* factors,

24    needs to say more about why its members, for example,

25    did not participate in this, because they are an

1    association, they have associational standing insofar as

2    they have members.

3                  The members have given them their proxy

4    with respect to representing their interests.  So it

5    doesn't seem to me that there's any additional

6    prudential standing issue as there would be if we're

7    talking about third party.  I'm not an association, I'm

8    just an individual who suddenly runs into court and

9    purports to be representing some other individuals'

10   rights; right?  Then I have to sort of explain why isn't

11   that other individual here pressing their own rights.

12   Those are the kinds of considerations that come up in

13   the prudential standing world that seem to me inapposite

14   when you're talking about associational standing.

15                  MR. ASMUS:  Fair enough, and let me

16   make one comment in that regard.  I understand where

17   Your Honor is coming from because as I read the cases

18   the third prudential standing requirement of a close

19   relationship looks a lot to me like the germaneness

20   prong of the constitutional standing.  My argument is

21   basically the same as to each.

22                  And -- but what I will say is that the,

23   one of the factors is whether there's a barrier that

24   prevents the individuals from suing.

25                  THE COURT:  Right.

1          MR. ASMUS:  And yes, that that analysis

2     certainly applies to the third party like in *Fiberlight*

3     where a nonparty to the contract was trying to get a

4     declaration as to the contract.  I think it applies

5     equally to an association.

6               THE COURT:  Why?

7               MR. ASMUS:  Because it's the same --

8               THE COURT:  Why?  I've never seen it.

9     I've never seen it.  In other associational cases,

10    right, when an association or an organization is suing

11    on behalf of its members, it does not bear the burden of

12    establishing that there's a reason its members didn't

13    bring this lawsuit.  That's just not a thing, as far as

14    I am aware, when the basis for standing is associational

15    standing.  When the basis is third-party standing, yes.

16               And so we did a little research into

17    this last night.  I did notice there were a case or two

18    that do apply the prudential standing in an

19    associational context.

20               MR. ASMUS:  Right.

21               THE COURT:  But I'm not sure that's

22    right.

23               MR. ASMUS:  Okay.  Well, fair enough.

24    And as to this particular issue --

25               THE COURT:  Yes.

1          MR. ASMUS:  -- with respect to the

2    argument about publicity, cost of litigation and risk,

3    neither party cited any case law to say those are

4    acceptable barriers in connection with a no-barrier

5    prudential standing inquiry --

6               THE COURT:  If one applied.

7               MR. ASMUS:  Fair enough.  And as you

8    noted, there are cases that talk about prudential

9    standing.  The Court is going to have to look into it

10   and figure that out.

11              THE COURT:  Right.

12              MR. ASMUS:  But with that, Your Honor,

13   I'll close my comments.

14              THE COURT:  All right.  Let me have

15   Plaintiff's counsel respond on just procedure and

16   standing, and then we'll get to the substance.

17              MR. ASMUS:  Thank you.

18              THE COURT:  All right.

19              You're back.

20              MR. LEVITT:  I think our brief really

21   laid it out in detail.  If there's a particular question

22   that you have that I could --

23              THE COURT:  I did ask that one and now

24   I've lost it.  Why is it that you believe that there is

25   standing to pursue the tort claims that you bring

60

1    against OptumRx on behalf of your members without member

2    participation?  Do you concede that where you're seeking

3    damages you got to have at least a member or two

4    involved in this as named plaintiffs?

5                    MR. LEVITT:  I think that California

6    law allowed representational standing.  I'm pretty sure

7    that we cited cases in our brief about that.

8                    THE COURT:  So what you're saying is if

9    I were to look up California tort law -- and again, you

10   know, I'm leery about doing that, me a D.C. judge

11   looking at the California law -- but if I were, you're

12   saying that there's some sort of a representational

13   standing doctrine that would allow you to pursue the

14   common law claims that you brought against Optum?

15                   MR. LEVITT:  Judge, I can't say with

16   the same certitude that I made representations to the

17   Court in my previous statements.  But while I'm sitting

18   down I can look for it in our brief.

19                   THE COURT:  I can look it up.  That

20   would be your response is that there's some -- because I

21   don't know that you do appreciate that there is this

22   whole thing about associations not being able -- to the

23   extent you're pursuing this under associational

24   standing --

25                   MR. LEVITT:  Yes.

1          THE COURT:  -- you might have a

2    problem, because if there are damages in this case

3    you're supposed to have an individual.  But maybe with

4    respect to -- but you know you're supposed to have

5    standing with respect to each claim.

6          MR. LEVITT:  Yes.

7          THE COURT:  You have to look at each

8    claim and figure out what the standing basis is.  And so

9    maybe I hear you saying with respect to the common law

10   claims it's not associational standing that you're

11   asserting but it is this representational standing issue

12   that is arising under California common law.

13          MR. LEVITT:  That is what I'm saying,

14   Judge, in addition to the fact that the core, the

15   essence of those claims is also just establishing that

16   the rule that they've established violates a law and

17   that they're declaring that they cannot enforce that

18   law.

19          THE COURT:  Yes, but are you

20   disclaiming an interest in damages?  Are they off the

21   table and then we don't have to worry about it?

22          MR. LEVITT:  You know, Judge, I think

23   that -- I don't even know at this moment that they

24   have -- I'm not sure that they have damages.  I'm not

25   sure if it's even ripe yet, because Optum after the

1    lawsuit was filed doesn't seem like they have enforced

2    this rule against pharmacies.

3             And so Optum and VAWD has allowed

4    people to put in applications.  And VAWD hasn't decided

5    those applications yet.  But so it's the long way of

6    saying, Judge, that the money damage part is far in the

7    back seat to establishing that Optum creating a law,

8    making new law, can recoup money from pharmacies is not

9    consistent with law and violates that California law.

10            THE COURT:  All right.  We'll give you

11   an opportunity to talk about whether you've adequately

12   alleged that claim.  But do you have any other points on

13   standing at this point?

14            MR. LEVITT:  Not on standing.

15            THE COURT:  All right.  Let me -- have,

16   let's see.  I'm going to get the names wrong.

17   Ms. Young.  Yes.  So you're on substance, yes?

18            MS. YOUNG:  Yes, ma'am.

19            THE COURT:  Okay.

20            MS. YOUNG:  Your Honor, may it please

21   the Court.  The challenge here in this case is to

22   Medicare Part D, and although I'm happy to answer any

23   questions Your Honor has either about Medicare Part D or

24   the procedural issues in this case, as we've discussed

25   for efficiency reasons, I'd like to spend my time this

1   morning focusing on the substantive question at issue in

2   this case, which is a simple one:  Are federal agencies

3   required to engage in notice-and-comment rule making in

4   order for private parties, here OptumRx and its

5   participating pharmacies, to enter into contractual

6   terms?  The answer is no.

7                    THE COURT:  All right.  Before you

8   leave that, let me just make sure we're all on the same

9   page.  Part of the reason why I walked him very

10  carefully through the claims that he purports to make is

11  because it appears as though the complaint very clearly

12  talks about the notice-and-comment alleged violation,

13  but he contends -- and I haven't really looked at the

14  complaint again -- but he contends that there's also

15  some sort of failure-to-act component of the APA claims

16  that he's bringing.

17                    Did you perceive those in the

18  complaint, and are you also going to talk about failure

19  to act?

20                    MS. YOUNG:  Yes, Your Honor.  But I'm

21  happy to address that now if you'd like to hear about

22  it, and it sounds like you would.

23                    THE COURT:  No.  You don't have to go

24  there.  I'm just trying to understand, does his

25  complaint make, allege failure to act in violation of --

1    I wish I had the statute book.  I think it's 7062 or

2    something.  Does he make that allegation?

3              MS. YOUNG:  No, Your Honor.  It's not

4    in the complaint.  We don't think there was fair notice

5    of this --

6              THE COURT:  Okay.

7              MS. YOUNG:  -- as required by *Twombly*,

8    and we brief this issue.  The complaint alleges that the

9    FDA must establish regulatory standards under the Drug

10   Quality and Security Act, but it suggests that VAWD

11   accreditation is not needed, and that's at the amended

12   complaint at 117 and 118.

13             And so there was no indication that

14   non-promulgation of the rule under the DQSA hurt

15   Plaintiffs.  Indeed, the complaint suggests that

16   existing law is sufficient to protect the supply chain.

17   So it's not clear how non-promulgation of any rule would

18   have hurt Plaintiffs here.

19             This claim also suffering from a

20   standing issue in addition to the fact that there was no

21   fair notice of it.  There is no evidence of any injury

22   in fact from non-promulgation of regulations under the

23   Drug Quality and Security Act, as the amended complaint

24   itself suggests.  Indeed, it's hard to see how

25   wholesalers could ever be harmed by a lack of stricter

1    regulations; having less regulations is usually

2    beneficial for them.

3                    THE COURT:  Do they claim injury?  Do

4    you see an injury?

5                    MS. YOUNG:  Your Honor --

6                    THE COURT:  So here is the thing that I

7    think is important is that we all remember that we're in

8    the motion-to-dismiss realm, and there are certain

9    procedural things that that are required and permitted

10   in that realm.

11                   So I'm trying to evaluate the

12   allegations of the complaint.  I'm supposed to be

13   focused pretty much only on the allegations of the

14   complaint and asking whether what he has said here,

15   assuming it's true, is sufficient to state a claim,

16   sufficient to establish standing, all of those things.

17                   So I'm just wanting to make clear that

18   some of the arguments in both sides, I think in the

19   briefing, lose sight a little bit of where we are

20   procedurally.  Are there allegations in the complaint

21   that indicate injury as a result of this failure to

22   promulgate the rules?

23                   MS. YOUNG:  No, Your Honor.

24                   THE COURT:  Okay.  Isn't that

25   sufficient to make the argument that the complaint is

1    insufficient?

2              MS. YOUNG:  Yes, that's correct,

3    Your Honor.

4              THE COURT:  On standing?

5              MS. YOUNG:  Yes.

6              THE COURT:  All right.  Okay.  So

7    getting back to the notice and comment.

8              MS. YOUNG:  Yes.  So I wanted to start

9    with the issues of agency here.  OptumRx, Your Honor, is

10   not a federal agency or an agent of the federal

11   government.  And the contractual VAWD term cannot be

12   attributed to the federal government.

13             As Your Honor is aware, Medicare APA

14   rule making and the Regulatory Flexibility Act apply

15   only to federal agencies.  OptumRx, however, is a

16   private entity operating under California law as

17   Plaintiffs themselves allege.  It does not have any

18   contractual relationship with the federal government.

19   Indeed, the complaint --

20             THE COURT:  All right.  Now wait a

21   minute.  I'm sorry.  Let me just -- so again, let's

22   remember we have to accept the allegations of the

23   complaint and what the plaintiff is alleging with

24   respect to the facts here.  So first of all, do we know

25   as a legal matter what would cause someone in OptumRx's

1      position to count as an agent?

2                          MS. YOUNG:  So --

3                          THE COURT:  Do you know?  In other

4      words, do you know what agency law says about what a

5      party has to do in order to have their conduct imputed

6      to the federal government?

7                          MS. YOUNG:  So, Your Honor, Plaintiffs

8      have never used any theory of implied or common law

9      agency to show that OptumRx is either an agent or an

10     agency of the federal government.  Instead, they've

11     relied on these two cases, which are really about agency

12     law.  But even under those cases, OptumRx would not

13     qualify --

14                         THE COURT:  Don't go to their cases.

15     Tell me, you might not have looked this up, but in order

16     to say they haven't stated a claim, right, the

17     allegations of the complaint related to what OptumRx

18     does in its system or whatever is not sufficient to

19     establish that OptumRx is an agent as a matter of law.

20     I need to know what the benchmark is.  I need to know

21     what the law says you have to do in order to be an

22     agent.

23                         And then we look at the complaint.  The

24     law says in order to be an agent, you have to do X, Y

25     and Z, see restatement of agency.  We look at the

1   complaint, it says none of that.  Therefore, he hasn't

2   stated a claim for agency.  I understand he's got some

3   cases that say, Look, look, I'm an agent, right.  But

4   I'm not sure those criteria are what really the law

5   requires in order to establish agency.

6                MS. YOUNG:  I mean, ultimately they

7   have to be an actual agency in order for the APA, RFA or

8   Medicare rule-making procedures to apply.  But in any

9   event --

10               THE COURT:  So how do you define an

11  agency?  What do you mean?

12               MS. YOUNG:  So those cases talk about

13  agency, and there are a bunch of factors courts look at.

14  Specifically they look at whether or not the government

15  entity has the authority to act with the sanction of

16  government support, whether it has authority and law to

17  make decisions and whether it has the authority to

18  exercise specific functions.

19               THE COURT:  That's all you have to do

20  to be an agency of the federal government?

21               MS. YOUNG:  Well, you have to be a

22  government entity in the first instance, which OptumRx

23  is not here.  That's a threshold requirement of

24  subsequent cases after both, I believe it's *Gideon* and

25  *Public Citizen*, Plaintiff cites, have recognized, and

1    that's consistent with the APA which defines an agency

2    as an authority of the government of the United States.

3                    THE COURT:  So that means you have to

4    be created, spawned?  First of all, I think he has given

5    up agency, right.  I think he said I'm not saying that

6    OptumRx is an agency, and I believe Mr. Asmus also

7    picked up on that.  So we really are only in agent

8    world, I think.

9                    MS. YOUNG:  Right.

10                   THE COURT:  But -- so setting aside

11   what you would need to do to be an agency, which I think

12   is what those cases are, is talking about.

13                   MS. YOUNG:  Right, Your Honor.

14                   THE COURT:  Do we know what you need to

15   do to be an agent?

16                   MS. YOUNG:  You would have to have some

17   sort of relationship with the government.  And here

18   OptumRx does not even have a contract with the

19   government.  Rather, the way the Medicare Plan D works

20   is that HHS contracts with Plan D sponsors.  Those

21   sponsors in turn contract with pharmacy benefit managers

22   like OptumRx in order to pull together different Plan D

23   sponsors and negotiate more favorable rates with

24   pharmacies.

25                   So then PBMs in turn contracted here

1  for the VAWD requirement with pharmacies who are

2  participating in their network.

3              THE COURT:  All right.  Wait.  You're

4  going so fast.

5              MS. YOUNG:  Okay, sorry.

6              THE COURT:  Is UnitedHealthcare, which

7  has a contractual relationship with both the government

8  and OptumRx, is UnitedHealthcare an agent of the

9  government for the purpose of the Medicare Plan D

10 administration?

11             MS. YOUNG:  No, Your Honor.  We don't

12 believe it's an agent of the government.

13             THE COURT:  How do you say that?  Why

14 do you say that?

15             MS. YOUNG:  I mean, it has a

16 contractual relationship with the government, but it's

17 not that kind of relationship with the sort of oversight

18 that would create an agency relationship.

19             THE COURT:  Where are you getting this

20 from?  What does the law say about the kind of oversight

21 you need in order to be an agent?

22             MS. YOUNG:  I mean, to be an agent you

23 would have to have some sort of apparent authority or

24 something more substantial.  But again, these common law

25 issues of agency have never been briefed and are outside

1    the context of administrative law and we don't think

2    they would apply here.  And in any event, we --

3                    THE COURT:  But if they don't apply

4    here, then how do you know that they're not an agent?

5    I'm just trying to get to the basis of the legal claim

6    that they are not an agent.  Not as a matter of fact but

7    as a matter of law, what do you need to do to be an

8    agent?

9                    MS. YOUNG:  Certainly something more

10   than as an issue here and certainly you would have to

11   have some sort of relationship.  And while, even if we

12   were to posit that a Plan D sponsor was in some way an

13   agent, which we don't, we absolutely do not concede that

14   point, we don't even have a contractual relationship

15   with PBMs here.  So we are even farther removed from

16   that situation.

17                   THE COURT:  So your point is that as a

18   legal matter you have to have a contract in order to be

19   an agent?

20                   MS. YOUNG:  You have to make some

21   allegations of some sort to suggest agency.  And there's

22   no allegations in the complaint whatsoever that suggest

23   that there's some sort of agent relationship between

24   OptumRx and the government.

25                   THE COURT:  Let me just tell you,

1   without understanding or knowing what -- because I

2   haven't researched this -- what the legal basis of the

3   of agency is, here is what they said, right, in the

4   world of, you know, that kind of seems like they could

5   have something with respect to agency.  They say OptumRx

6   is a PBM that reports to UnitedHealthcare.  United

7   Healthcare reports to CMS.  CMS is an agency.

8                    CMS doesn't know how to administer this

9   thing on its own.  CMS hires contracts with

10  UnitedHealthcare to develop the rules and create the

11  structure by which this is being administered.  And

12  UnitedHealthcare contracts with OptumRx.

13                   So on the level of we don't really know

14  what agency really means as a legal matter, but it

15  sounds like there is some relationship, right, that's

16  what they say.  Now, why isn't that sufficient?  You

17  keep saying But that's not enough to prove agency, but I

18  don't know that, because I don't know what the legal

19  test for agency is.

20                   MS. YOUNG:  Your Honor, I think there

21  has to be more than that, and we'd be happy to provide

22  supplemental briefing on that issue.  The plaintiffs

23  have never argued that.  They've instead relied on these

24  case laws about agency, and now they're doing a switch

25  where they're saying it's just a federal agent and it's

1    this amorphous concept of common law, whether or not

2    someone is an agent, and that's never been briefed here.

3                    And even putting agency aside, the

4    contractual -- at issue here would not be a rule subject

5    to notice-and-comment rule making.

6                    THE COURT:  All right.  So assuming

7    this is the second part of your argument.  Assuming that

8    they meet whatever test exists in the law for agency,

9    not being a government agency but for agency being an

10   agent of the government with respect to the operation of

11   Medicare Plan B, you say that as an agent this decision,

12   making this rule, this policy in your contractual

13   agreements is not a rule.

14                   MS. YOUNG:  That's correct, Your Honor.

15                   THE COURT:  All right.  So why?

16                   MS. YOUNG:  So the contractual term is

17   not a rule subject to APA, Medicare or RFA rule-making

18   responsibilities.  And I think the D.C. Circuit's

19   decision in EPA -- sorry, *Association of Irritated*

20   *Residents v. the EPA*, and that's 494 F3d 1027, is

21   instructive here.  There, Your Honor, the EPA entered

22   into 2,500 identical term consent decrees with animal

23   feeding operations regarding emission standards.

24                   The D.C. Circuit held that the consent

25   decrees were not rules for two reasons, both of which

1    are applicable here.  First, the consent decrees do not

2    prescribe law.  Rather, they simply delayed enforcement

3    of the statute and did not grant an exemption from it.

4    A noncompliance was not illegal.  It just meant that the

5    EPA would have -- that if the -- sorry, animal feeding

6    operations had breached, then the EPA can then choose to

7    sue them if it wanted to.

8              This is similar to our case because the

9    VAWD contractual term does not prescribe law either.  It

10   is not illegal for participating pharmacies to decline

11   OptumRx's terms and conditions.  They just won't get

12   reimbursement, as Your Honor pointed out, for

13   prescriptions dispensed to OptumRx's patients.

14   Moreover, the VAWD contractual term isn't taking over

15   the whole of the marketplace.  It would only apply when

16   a PBM or a Plan D sponsor puts that into their contract

17   with pharmacies.  So it's not to say every single PBM or

18   Plan D sponsor has made such a requirement.

19             THE COURT:  Does it matter that OptumRx

20   is such a big part of the market?

21             MS. YOUNG:  No, Your Honor, it does

22   not.  It's the product of negotiation between two

23   private parties, which is the way Medicare D, Medicare

24   Part D is set up.

25             THE COURT:  Does it matter that the

1    federal government allegedly does have something to do

2    with some of the terms in that private contract?

3                    MS. YOUNG:  No, Your Honor.  Again,

4    there's a statutory noninterference provision.  The

5    government is not supposed to be involved in the -- it's

6    not supposed to interfere with negotiations between the

7    private parties.  That's -- Congress' intent was to have

8    this be a competitive marketplace, and the government

9    was not supposed to interfere with that sort of

10   competition.

11                   THE COURT:  Even to prevent the

12   alleged, alleged anti-competitive effects of the terms

13   of a particular contract?

14                   MS. YOUNG:  There certainly are some

15   circumstances which the government could get involved

16   without violating the statutory noninterference

17   provision, Your Honor.  But it doesn't really get

18   involved in contracts at the base level.  Mostly it just

19   makes rules that affect the contracting process as a

20   whole, which we've already discussed today.  And then

21   occasionally it will take compliance action based on the

22   contracting process.

23                   So, for example, CMS has taken

24   compliance action where Aetna, which was a Plan D

25   sponsor, tried to deny a set of pharmacies the ability

1    to participate in their Part D system of networks

2    through the Any Willing Pharmacy procedure, and that

3    procedure is separate.  It's mandated by statute, and

4    basically there's receipt of standard contracting terms

5    which must be reasonable and relevant.  And then any

6    willing pharmacy who wants to participate can sign up.

7    But that process is separate from the normal --

8                THE COURT:  I understand, but that

9    example seems to hurt you, not help you; right?  Because

10   to the extent that there was some interference by the

11   government in order to protect sponsors or pharmacies or

12   somebody who was getting cut out of the system, isn't

13   that what's allegedly happening here?

14               MS. YOUNG:  No, Your Honor.  So first

15   that was separate from the private negotiations that

16   were going on here.  This is an entirely separate

17   process.  Most contracts are made through the process

18   that was at issue here, which is the normal competitive

19   negotiation.  This is a separate process mandated by

20   statute.  And it requires that the contractual terms

21   actually be reasonable and relevant, and it wasn't

22   meeting that statutory requirement.

23               THE COURT:  I see.  So you say there's

24   no reasonable or relevant overlay to the private

25   negotiation contracts that are happening in this world.

1           MS. YOUNG:  Correct, Your Honor.  And

2    that is the only time CMS is aware of where it

3    interfered in the contracting process in any way, other

4    than through ordinary rule-making procedures.

5           THE COURT:  But isn't it weird that --

6    it's one thing to say the government has entirely hands

7    off with regard to the private negotiations that OptumRx

8    has with its pharmacies because we want to promote

9    competition in this marketplace and if the government

10   gets involved we're going to have a problem.

11          But we have a scenario here that is

12   interesting in two ways.  One, it seems to me that

13   everybody is agreeing that some of those contract terms

14   are set by the government in this world.  So we're not

15   talking about a blank slate contracting process between

16   OptumRx and pharmacies.  I don't know what to do with

17   that analytically, but that is apparently happening.

18          And then second, I think the plaintiffs

19   are arguing the government has an obligation under this

20   circumstance to prevent the anti-competitive

21   negotiations that are occurring.  So it's one thing to

22   say government is going to take their hands off of it so

23   that we can have competition in the marketplace.  But in

24   a situation like this where they are at least

25   alleging -- and again, we have to take that as true at

1     the motion-to-dismiss stage -- that the government is

2     standing back while this private negotiation is actually

3     doing something anti-competitive, cutting people out of

4     the process of reimbursement in this way, isn't there an

5     obligation of the government to step in at that point

6     and say something?

7                    MS. YOUNG:  No, Your Honor.  The

8     government is not required to fill every gap in the

9     marketplace.  Under Plaintiff's theory, every time

10    there's a contractual term between a PBM or a Plan D

11    sponsor and a participating pharmacy, the agency would

12    have to engage in notice-and-comment rule making and

13    then ultimately publish the contractual term in the

14    Federal Register before any of the these entities can

15    actually begin administering Part D.  That would include

16    even the simplest of terms such as the pharmacy

17    operating hours, and it would be antithetical to the

18    text and structure of Medicare because it would make

19    it -- you would turn the whole of Medicare Part D, which

20    is supposed to be this competitive marketplace, into

21    essentially a government operation.

22                    THE COURT:  I think you're not

23    answering my question, right.  I think -- I'm not

24    talking about pharmacy hours.  I'm talking about a term

25    in the contract between Optum and the pharmacies that is

1    the opposite of creating a competitive marketplace.

2    That is actively allegedly undermining the competitive

3    marketplace because it is saying you can only buy your

4    drugs if you're going to be reimbursed from this segment

5    of the market and not the whole market.

6            Why isn't that different from the

7    standpoint of the government's obligation to get

8    involved and to make sure that that, that that

9    provision -- I'm sort of setting aside whether or not

10   notice and comment has to apply for a second.

11           MS. YOUNG:  Okay.

12           THE COURT:  And just wondering whether

13   there is some sort of -- you keep talking about this is

14   a competitive marketplace.  That allegedly is not

15   competitive.  And the plaintiffs are complaining that

16   the government has stood by and allowed this to happen

17   and presumably even under its own auspices because they

18   say OptumRx has been authorized to engage in this sort

19   of behavior.

20           MS. YOUNG:  So, Your Honor, a couple of

21   points I'd like to make in response.

22           So first, again, the government is not

23   required to immediately do something to the marketplace

24   every time someone makes a complaint about it from a

25   contractual term even if the allegation is that it's

1   anti-competitive.

2          But in addition to challenging this

3   sort of agency and action, Plaintiffs would first need

4   to petition for rule making in order to say, like, they

5   would need to petition that the agency make a rule that

6   the VAWD, you know, no VAWD accreditation requirements

7   is allowed.  And as far as we know, Plaintiffs have not

8   made any such petition for rule making.  And so that's a

9   problem.  They would need to do that first before they

10  could bring any sort of challenge like that.

11          THE COURT:  That's interesting.  Thank

12  you, that was helpful.  So this is not a rule, according

13  to you.

14          MS. YOUNG:  Yes, this is not a rule,

15  Your Honor.

16          The second factor that the D.C. Circuit

17  found persuasive was that consent decrees did not make a

18  statement with regard to substantive statutory

19  standards.  Rather, they just delayed implementation

20  pursuant to the agency's enforcement discretion.  We

21  think that is similar to our case because the VAWD

22  contractual term is not statutorily required as

23  Plaintiffs themselves have repeatedly admitted.

24          Indeed, the complaint alleges that the

25  term is not sanctioned by HHS or any of its subagencies,

1    and no federal law requires the VAWD accreditation.

2                    And moreover, Your Honor, the complaint

3    suggests and as we've just discussed, HHS could choose

4    to make VAWD a requirement or not at a later date when

5    the FDA implements regulations for wholesalers pursuant

6    to the DQSA.  But obviously the FDA is not a party to

7    this litigation, and moreover, the agency gets time to

8    decide whether or not it should or shouldn't do it; and

9    as we've just discussed, Plaintiffs haven't even changed

10   this inaction by filing a petition for rule making in

11   the first instance.

12                    THE COURT:  What's interesting is how

13   these two things collapse in the sense that I'm not

14   sure, I'm not entirely sure that analytically you can

15   accept that OptumRx is acting as an agent.  Remember

16   we're sort of now in the part of your brief where you

17   say even if they are an agent, here are all the reasons

18   why it's not a rule.

19                    These reasons that you're now saying

20   turn in a sense on the fact that OptumRx is doing this

21   as a private independent party and the agency hasn't

22   taken a position.  Right?  You say the agency -- I'm

23   reading the transcript here as we go along -- the

24   agency, you know, the FDA is not a party to this

25   litigation, the agency gets time to decide whether or

1   not it should or shouldn't do.  Theoretically in the

2   world that we're in, given what you've already said,

3   OptumRx is the agency for the purpose of this; right?

4            MS. YOUNG:  I mean, this is on the

5   basis of Plaintiff's own complaint where Plaintiff has

6   admitted that there's still room for the agency to

7   actually prescribe law here.  And clearly the VAWD

8   contractual term does not prescribe law.  Whether or

9   not OptumRX has any --

10           THE COURT:  But that's only insofar as

11   you reject their claim that OptumRx is acting as the

12   agent.

13           MS. YOUNG:  No, Your Honor.

14           THE COURT:  That its policy that it's

15   created can be imputed to the government, right?

16           MS. YOUNG:  No, Your Honor.  I don't

17   think that's right because, again, the contractual term

18   doesn't take up the whole of the marketplace, the same

19   way a rule would.  A rule would be applicable to

20   everyone in Part D.

21           The contractual term only applies

22   insofar as a PBM or a Plan D sponsor insists on that

23   contractual term, and it would only apply to pharmacies

24   that want to participate.

25           THE COURT:  Let me ask you a question.

1    This is the hypothetical that he brought up, because

2    this is testing my admittedly perhaps off-base theories

3    about this.

4                Assume that we didn't have OptumRx and

5    we didn't have this multilayered system of all of the

6    various players.  Let's say we're talking about CMS.

7    CMS knows how to administer this, and it decides you

8    know what, we think VAWD accreditation is important.  We

9    contract with individual pharmacies to administer the

10   Medicare -- this is in my hypothetical -- and we are

11   going to put in every contract that we enter with the

12   pharmacy a provision that says you got to buy from a

13   VAWD person.  Do we have a rule or no rule under those

14   circumstances?

15               MS. YOUNG:  Yes.  So under your

16   hypothetical, Your Honor, CMS is not issuing a rule

17   requiring the VAWD contractual term.  It's just putting

18   it into all of its contracts.

19               THE COURT:  It has a policy, yes.  It

20   has a policy that it puts in its policy manual, and in

21   every single contract from this day forward, it's going

22   to put that contract provision in every single one from

23   this day forward.

24               Is that -- could that be challenged on

25   the basis of it being a rule in effect even though not

84

1    stated as a rule and therefore it needed to go through

2    notice and comment?

3                    MS. YOUNG:  That certainly would be a

4    much closer case than the case we have here, Your Honor.

5    Especially if it's universally applicable where it is in

6    many ways functioning like a rule.

7                    THE COURT:  Uh-huh.  Does it matter

8    that it would have to go to the entirety of every single

9    pharmacy, or could they say with respect to this segment

10   of pharmacies that we contract with our policy is you

11   have to be VAWD accredited?

12                   MS. YOUNG:  Your Honor, I think VAWD

13   accreditation is something the agency is looking at with

14   regard to the Drug Quality and Security Act, and it

15   would issue that pursuant as a rule rather than as a

16   contractual term.  And again, that's a much --

17                   THE COURT:  But if it chose to do

18   contractual term because it didn't want to go through

19   notice and comment -- notice and comment is a pain.

20   We're not going to do it.  We're just going to in all of

21   our -- let's say we carve -- I know my hypothetical is

22   getting far away, but I'm actually testing certain parts

23   of your argument.  Okay.

24                   There is no UnitedHealthcare and Optum.

25   CMS is contracting with the pharmacies directly, all

1     right.  And CMS decides that for all of the pharmacies

2     in one segment of the country, all of the pharmacies in

3     the northeast, we are going to, every time we have a

4     contract, require that they be VAWD accredited.  Right.

5     Notice and comment required or not?  Is that -- would

6     that be subject to a challenge as a rule that needed to

7     go through notice and comment or not?

8                    MS. YOUNG:  I certainly think that

9     would be subject to a challenge, Your Honor.  Whether or

10    not the agency would have other defenses to why that

11    wasn't a rule that I'm not thinking of on the spot, I'm

12    not sure.

13                   THE COURT:  Right.  But you're

14    saying -- so the reason why this case is different is

15    because we have these other people who are doing it

16    because it's OptumRx that's doing it and not CMS, is

17    that your argument?

18                   MS. YOUNG:  Your Honor, CMS is in no

19    way mandating this contractual requirement.  It has

20    nothing to do with the contractual requirement.  It

21    didn't direct it.  It's the product of private

22    negotiation between private parties.

23                   THE COURT:  Right.

24                   MS. YOUNG:  It's three or four orders

25    removed from any federal government action.  And as

1    Plaintiffs themselves admit, the agency still has the

2    authority to either make this a, you know, a rule and a

3    requirement or to choose to do the opposite.

4                    THE COURT:  So this is really all about

5    whether or not OptumRx is, in fact, an agent; right?

6    Because if it is an agent, whatever that means under the

7    law, and its decision to invoke this policy in every one

8    of its contracts can be imputed to CMS as though there

9    were no difference between OptumRx and CMS, then they

10   would, perhaps, be stating a claim for this; right?

11                   MS. YOUNG:  No, Your Honor.  I still

12   don't think that's right because the contractual term

13   which, again, is only taking up a portion of the

14   marketplace does not prescribe law.  It doesn't make

15   noncompliance illegal.  Because it's just -- in fact,

16   that might actually be a problem with your previous, an

17   issue with the previous hypothetical I didn't address.

18                   THE COURT:  Right.  That's precisely

19   what I was trying to get at, right.

20                   MS. YOUNG:  Yes.  That would also maybe

21   not be a rule because it's not making noncompliance

22   illegal.  It would just be a breach of the contract

23   instead of a rule which actually would, in fact, make

24   noncompliance illegal.

25                   THE COURT:  I think I understand.  Do

1    you have any other points?

2                    MS. YOUNG:  I just wanted to address

3    briefly with regard to the rule-making issue.  Plaintiff

4    alleges that the Medicare rule statute is broader than

5    for the APA as its counterargument to why supposedly

6    this contractual term is a rule.

7                    As Your Honor held in *Clarion*, we don't

8    believe that -- we don't believe --

9                    THE COURT:  *Clarion* is on appeal.  I

10   don't know that you can go with *Clarion*.

11                   MR. ASMUS:  The definition of a rule is

12   actually coextensive except for certain APA exceptions

13   which are inapplicable here.  And to read the

14   contractual terms again, as Plaintiffs have asked this

15   Court to do, would turn essentially every contractual

16   term between a pharmacy benefit manager and a

17   participating pharmacy into a rule related to services

18   and benefits under Medicare that would then be, have

19   to -- first be proposed by the secretary and then

20   undergo notice and comment and then ultimately be

21   published by the Federal Register, which would

22   completely upend the Plan D marketplace.

23                   For these reasons, Your Honor, we

24   believe that summary judgment should be granted in favor

25   of the federal defendants.  The VAWD contractual term

1    was not made by the federal defendants or attributable

2    to it.  It's the product of negotiation between private

3    parties, and its impact on Plaintiffs is three or four

4    orders removed from the agency itself for any government

5    entity.  Accordingly, the term cannot and should not be

6    attributed to the federal defendants and summary

7    judgment should be granted in the federal defendants'

8    favor.

9                    THE COURT:  Thank you.  All right.  The

10   question is whether we should let Mr. Levitt respond.

11   Why don't we do that, and then we'll go to the state

12   claims.

13                    MR. LEVITT:  Thank you, Your Honor.

14                    THE COURT:  Thank you.

15                    MR. LEVITT:  So agency.  Agency is

16   fiduciary relationship that arises when one person or

17   principal manifests assent to another person, an agent,

18   that the agent shall act as principal on behalf of and

19   subject to the principal's control.

20                    Here obviously the principal we're

21   saying is CMS and the agent is Optum.  And that's on the

22   restatement of agency, Judge.  There's also some law on

23   the topic.  Agency is very broadly defined under the

24   Administrative Procedures Act.  As, quote, "any

25   written" -- excuse me -- "any authority of the

1    government of the United States whether or not it is

2    within or subject to review by another agency," and

3    that's *Soucie* -- S-o-u-c-i-e -- *v. David*.

4                    THE COURT:  Let me just -- I'm mindful

5    of the time and I want to get right to the point.  Thank

6    you for the restatement point.  I wonder whether the

7    noninterference issue doesn't defeat it to some extent

8    because we know that the CMS permits these contracts

9    without its supervision and, in fact, it says we're not

10   going to interfere, right.  So that's one point.

11                   But the other point is to the extent

12   that you're relying on the case that you raised earlier,

13   the bankruptcy case, aren't those factors really in the

14   context of evaluating whether something is an agency

15   rather than agent?

16                   MR. LEVITT:  No, no.

17                   THE COURT:  Okay.

18                   MR. LEVITT:  Agent, not agency.  Optum

19   is not an agency.  They're not an agency of the

20   government.

21                   THE COURT:  Right.

22                   MR. LEVITT:  They're an agent.

23                   THE COURT:  Right.  So you have to pick

24   the cases that talk about what an agent is as opposed to

25   cases that analyze whether something is an agency.

1          MR. LEVITT:  The case that I just

2  cited, *Soucie*, was not about whether an entity was an

3  agency of the government.  It's whether the agency

4  principals apply.

5          THE COURT:  Correct.  But what about

6  the case that is what has been briefed, the bankruptcy

7  case that you talked about earlier?

8          MR. LEVITT:  *Gideon*.

9          THE COURT:  *Gideon*.  Isn't that an

10  agency case?

11          MR. LEVITT:  No, no.  In that case the

12  trustee was acting as an agent of the bankruptcy court.

13          THE COURT:  All right.

14          MR. LEVITT:  So not agency, agent.

15          THE COURT:  Okay.

16          MR. LEVITT:  And so here -- and I'm

17  mindful of the time so I'm going to be very brief, but I

18  want to just talk about money for a second.  And counsel

19  said that it's just a contract term, it's not really a

20  rule.  The result of not following the arbitrary and

21  capricious standard of you can't buy from a secondary

22  wholesaler, the penalty for that is we're going to

23  recoup 100 percent of the money.  Counsel raised the CMS

24  letter --

25          THE COURT:  Wait.  I disagree with your

1    characterization, because to the extent that you're

2    saying that, it sounds as though what you mean is that

3    they're going to reach back in time prior to having

4    enacted this policy and recoup the money that has

5    already been paid to pharmacies who didn't know anything

6    about the policy.

7              That's not what's happening.  What

8    they're saying is going forward, here is what you need

9    to do.  And if you opt not to do that, we're not going

10   to reimburse you.  If we accidentally reimburse you,

11   we'll take the money back because we're telling you now

12   that from this day forward you don't get reimbursement

13   for this.  What is wrong with that in terms of, you

14   know, anything?

15             MR. LEVITT:  Okay.  What is wrong with

16   that is that the second -- HHS here today has endorsed

17   the secondary marketplace.  What is wrong with that is

18   that that rule, the VAWD rule -- by the way, there's 100

19   different VAWD rules.  There's only one that we take

20   issue with, and that's the one that says a secondary

21   wholesaler can't buy from a pharmacy.

22             So that act of buying from a pharmacy

23   is consistent with a myriad of laws.  I just wanted to

24   cite to Your Honor, and I'm not going to talk about

25   them, Judge, just very briefly.  There is the Drug

1   Supply Chain Security Act, the DSCSA, which was enacted

2   well after this VAWD rule came about.

3              So the Drug Supply Chain Security Act

4   permits my clients to buy from pharmacies.

5              THE COURT:  So does the VAWD rule.

6              MR. LEVITT:  No, it doesn't.

7              THE COURT:  Let me tell you why.

8   Because if they buy from a pharmacy, they're free to

9   sell their drugs to companies that aren't in the Optum

10  network.  They're free to buy from a pharmacy in

11  general.  What it says is you're not going to be

12  reimbursed if those drugs end up in the hands of someone

13  who is on Medicaid or Medicare or whatever program is

14  being implemented.  That is very different than saying

15  you do have the legal ability to undertake this

16  particular act.

17              MR. LEVITT:  You can't get VAWD

18  accredited if you do the act.

19              THE COURT:  Right.

20              MR. LEVITT:  And this goes with your

21  comment earlier about there's some reluctance with the

22  Court to put a stamp of agent on a PBM.  But just --

23  there could be millions of folks who are stamped, we're

24  breaking out these millions of stamps.  But the reality

25  of the situation is there's essentially four PBMs that

1   adjudicate 80 percent of all drug claims in the United

2   States, Optum being one of the biggest two.  There's

3   Optum, Caremark, Express Scripts and Humana, and Prime

4   is sort of this -- that's it.  That's 81 percent of

5   every drug claim.

6                 So when a pharmacy makes its

7   decision --

8                 THE COURT:  Do you know how much of

9   Optum's portfolio are people who are coming in through

10  Medicare Part D?  I assume they have other coverage

11  bodies, don't they?  Other groups?  Optum is not a

12  hundred percent Medicare Part D, correct?

13                MR. LEVITT:  That's true, Judge, and

14  it's a very important inquiry.

15                THE COURT:  Do you know?

16                MR. LEVITT:  I will tell you that of

17  all the prescriptions in the United States, the

18  percentage that is part of Medicare is significant,

19  maybe 30 percent.

20                THE COURT:  I understand.  But it's

21  important, right?  Because if it turns out that that

22  30 percent of prescriptions of all the prescriptions in

23  the United States that are under Medicare Part D are

24  mostly with the other three PBMs and not Optum, Optum's

25  portfolio of Medicare Part B is 10 percent, it's a

1    hypothetical, I'm picking it out of the air, right.

2                    MR. LEVITT:  Uh-huh.

3                    THE COURT:  Then really we're only

4    talking about 10 percent of Optum not getting reimbursed

5    for the conduct that you say is problematic.

6                    MR. LEVITT:  It's very important.

7    First of all, Optum is a much larger percentage than

8    10 percent of Medicare for the drug claims.  Much, much

9    more.  But let's assume the facts in your hypothetical.

10   Let's say it's 10 percent.  So now you have a pharmacy

11   that is going to know if I get audited by Optum and they

12   asked where I bought this drug from, they're going to --

13   I'm going to forfeit my money, we're not going to

14   process the claim as you're saying.  Then they're

15   saying, Hmm, Should I maybe buy from one AIPW member

16   from the other three big, you know -- Express Scripts

17   didn't make this declaration and Caremark didn't.

18                    So should I buy from AIPW because I'm

19   in the process claim for these other three, and maybe

20   I'll just use the AIPW drugs from those other big three.

21   So when the pharmacist is doing his job and he goes over

22   to the shelf to pick out medication, he's going to say,

23   Oh, wait, who is the PBM, is it Optum or is it Express

24   Scripts?  Maybe I'll pull the bottle that's a VAWD

25   bottle versus a non-VAWD bottle.  That's not going to

1   happen.

2           The actual practical answer to your

3   question is that the secondary wholesale market, which

4   is endorsed by HHS is done if Optum, one of the big four

5   players processing a quarter of the Medicare

6   prescriptions in the country, says forfeiture is the

7   result of you usually buying from the secondary

8   wholesale market.

9           So the game is over.  It's not like you

10  can just, Well, I still have the other 80 percent.  My

11  clients, two of whom are here today, their business is

12  done if Optum is allowed to make this super law, a law

13  that's not really a law.  It's not really a rule.  It is

14  not endorsed by HHS.  HHS said we don't endorse this

15  rule.

16          THE COURT:  I understand, but you know,

17  you have to -- I say this to my clerks all the time,

18  right.  Not every wrong has a remedy.  Not every wrong

19  has a vehicle by which you can get into federal court

20  and press a claim and, you know, make an allegation.

21  And so one of the challenges I think you face in the

22  context of this lawsuit is pointing to a federal statute

23  that prescribes conduct or action by the government,

24  right, and saying that a rule or policy or whatever that

25  Optum, private party, not government, has implemented

1   violates that law.  That's a huge hurdle.

2                    MR. LEVITT:  I don't think so, Judge.

3   I think it's an important hurdle.  I'm not minimizing

4   it.

5                    THE COURT:  Tell me why it's not -- and

6   please understand the implications for, as I said at the

7   beginning, the operation of the healthcare system writ

8   large.

9                    MR. LEVITT:  Yes.  So you are -- you

10  have put your finger on the pulse of the essence of what

11  is wrong with the drug system that you cannot pick up a

12  newspaper without seeing drug pricing, drug pricing.

13                   If Optum is not an agent of HHS, if HHS

14  can come in and say We don't endorse this, but they can

15  go and make this rule that we don't endorse and if a

16  pharmacy violates it they can take back the money and,

17  by the way, what do they do with the money?  Does the

18  money go back to HHS, or does Optum just keep the money,

19  as they are a fiduciary or aren't they.  Can a PBM do

20  whatever they want to do in our healthcare system?

21                   THE COURT:  The government says yes,

22  not whatever, but again, noninterference rule.  Private

23  contracts.

24                   MR. LEVITT:  Well, the government --

25  first of all, this is not a private contract.  It's not

1    a private contract.  This contract -- if it was a

2    private contract, me and somebody else in this courtroom

3    could enter the contract and say just about whatever we

4    want to say.  The difference between the contract

5    between CMS and UnitedHealthcare is that the Social

6    Security Act has said you have to put these terms in

7    that contract.  And you, plan sponsor, United, when you

8    enter into a contract with PBM, you can't just enter

9    into whatever contract you want.  You have to put terms

10   into that contract that are subject to the Social

11   Security Act.  And it goes on down the tier.

12                  THE COURT:  All right.  I think I

13   understand your point.  We need to let the court

14   reporter take a break.  Let me ask you, do you have any

15   more points on this, because I want to come back on

16   California law for about 15 minutes and then we'll be

17   done.

18                  MR. LEVITT:  My only other point,

19   Judge, is the noninterference clause.  HHS has made the

20   clearest pronouncement on the noninterference clause.

21   And counsel even gave an example where CMS wrote a

22   letter to Aetna and said, You guys are subject, you're

23   administering the healthcare program, Medicare, you're

24   not following the rules.  If you don't follow the law

25   and have reasonable and customary terms, we're going to

1   kick you out of the network.  Is it a reasonable and

2   customary term, by the way, to take back, to forfeit

3   money --

4                   THE COURT:  She said that doesn't apply

5   to this part of the overall structure.  The reasonable

6   and customary is a different thing.

7                   MR. LEVITT:  It's not because payment

8   is the ultimate term in any contract.  Here it says,

9   We're not going to pay you if you follow the law but

10  don't follow this arbitrary and capricious standard of

11  this super law thing that VAWD established.

12                  The noninterference clause, the

13  government has said, HHS has said, CMS has said in the

14  administration of Medicare program that there are

15  numerous statutory provisions that require CMS to

16  directly intervene in the contractual relationship

17  between the party sponsors and network pharmacies.

18                  THE COURT:  Where are you reading from?

19                  MR. LEVITT:  This is from the guidance

20  issued by CMS on, in May 2014.  And it goes on from

21  that.  I don't want to belabor.

22                  THE COURT:  All right.  Let's take a

23  five-minute break and we'll come back with Mr. Asmus on

24  California law.  All right?

25                  (Recess)

1          THE COURT:  Finish it up with Mr. Asmus

2   and Mr. Levitt if you want on the California claims.

3          MR. ASMUS:  Your Honor, I don't know if

4   you heard enough on the other issues, but Ms. Young had

5   a couple of quick points.

6          THE COURT:  Quick points, okay.

7          MS. YOUNG:  Thank you, Your Honor.  I

8   just wanted to address three quick points raised by

9   Plaintiff, Your Honor.

10          First with regard to agency, whether a

11   private party is an agent for the federal government can

12   vary --

13          THE COURT:  Let me have you pull the

14   microphone right down to you.

15          MS. YOUNG:  Whether a private party is

16   an agent for the federal government can vary,

17   Your Honor.  Sometimes an entity can be an agent for

18   some purposes but not others.  In order to trigger

19   notice-and-comment rule making, you need to be an

20   agency, not just an agent of the federal government.

21          THE COURT:  Where are you reading that

22   from?

23          MS. YOUNG:  Also in order to submit

24   rules under Federal Register --

25          THE COURT:  Where are you getting that

1    from?

2                    MS. YOUNG:  I mean, just --

3                    THE COURT:  I'm sorry.  In order to

4    trigger -- you're looking at the rules related to the

5    APA or what's the source of the statement that you have

6    to be an agency?

7                    MS. YOUNG:  To submit rules under the

8    Federal Register, you have to be an agency, Your Honor.

9                    THE COURT:  Uh-huh.

10                   MS. YOUNG:  And at the very least there

11   need to be an agency delegation of authority to issue

12   rules, and there's no such delegation here and

13   Plaintiffs haven't made any allegations to show

14   otherwise.

15                   THE COURT:  Uh-huh.

16                   MS. YOUNG:  Secondly, Plaintiff's

17   counsel said that these were not private contracts

18   simply because the government has required certain terms

19   be entered into them.  We don't believe that's right,

20   Your Honor.  I think an analogy can be found with regard

21   to the Consumer Financial Protection Bureau.

22                      As Your Honor may be aware, the CFPB

23   pursuant to the Truth in Lending Act often requires for

24   home purchasing agreements that homeowners and lenders

25   agree to certain disclosure requirements that are

1    required by contract.  But that doesn't make the CFPB a

2    party to the contract, nor does it make the homeowner or

3    the lender an agent of the federal government.  The

4    government often has a role to play in private party

5    contracts.

6                    And the third issue that I wanted to

7    address briefly is that, again, the reasonable and

8    relevant standard is for the Any Willing Pharmacy

9    procedures for contracting, which are separate from the

10   private negotiation process that's at issue here.  And

11   in any event, to the extent Plaintiff is complaining

12   that we've at least once engaged in some sort of

13   compliance action and aren't doing so here, that is

14   subject to the agency's enforcement discretion pursuant

15   to the Supreme Court's decision in *Heckler v. Chaney*.

16                    Thank you, Your Honor.

17                    THE COURT:  Thank you.

18                    MR. ASMUS:  Your Honor, the one final

19   comment I'd like to make before I leave that issue is

20   that the issue is one of agency, and, frankly, I'm not

21   sure that a principal agent relationship is the same

22   thing as an agency for purposes of APA.  And that's

23   really the issue.

24                    THE COURT:  That's the point that she

25   was making about it.  You have to be an agency in order

1   to --

2                    MR. ASMUS:  Yes, you have to be an

3   agency, not simply an agent.

4                    THE COURT:  Right.

5                    MR. ASMUS:  And we agree that we are

6   neither an agency nor an agent for purposes of this

7   particular matter.

8                    With respect to the state law claims, I

9   want to start by going back to a comment that you were

10  raising towards the beginning of the argument, and that

11  is should you be considering those claims.

12                   And as a first matter, if Counts

13  I through III are dismissed on the motion, our position

14  is that the Court has no reason to exercise supplemental

15  jurisdiction over the remaining counts.

16                   In addition, if the Counts I through

17  III are no longer involved in the case, I think there

18  are issues of diversity of citizenship jurisdiction as

19  an alternative basis for federal jurisdiction.  I think

20  there are issues of personal jurisdiction.  What is the

21  D.C. nexus as it relates to the claims that are asserted

22  by new AIPW or the conduct of Optum as it relates to the

23  District of Columbia.  And I think there are issues as

24  we talked about before, there are venue issues that

25  would need to be raised and briefed.

1          THE COURT:  Interesting.  So your

2    thought is that if the federal claims go away, it's not

3    like I can just march right into the others.  I would

4    have to consider not only this venue as a general matter

5    but whether I would even have jurisdiction to address

6    the California claims.

7          MR. ASMUS:  And, Your Honor, I don't

8    have the cases.  I did take a quick look.  I think that,

9    for example, diversity jurisdiction, I think there would

10   need to be a -- there's case law that says there needs

11   to be an analysis of the individual citizenship of new

12   AIPW's members to determine whether there's complete

13   diversity.  It's not as simple as saying new AIPW is a

14   corporate entity by itself and Optum in doing that

15   analysis.

16          Personal jurisdiction would be long-arm

17   statute potentially.  What's the business that's here as

18   it relates, you know, specific versus general personal

19   jurisdiction.  None of those have been briefed, of

20   course, but I think that there are issues that the Court

21   would have to resolve if Counts I through III are

22   dismissed.

23          THE COURT:  And your position -- would

24   your position be that I would need to be the one to do

25   that, or would it be that the Court should maybe perhaps

1    as a matter of discretion transfer this to another place

2    where it could have been brought, say some district in

3    California, and then let them be the one to determine

4    whether there's jurisdiction remaining over the federal

5    claims?

6                    MR. ASMUS:  Well, the issue is that the

7    complaint pleads first, federal question jurisdiction.

8    Second, supplemental jurisdiction.  And then as a

9    catch-all, as I read it, diversity jurisdiction.  So

10   those assertions have been made, not briefed, and I

11   guess I'm telling you, Your Honor, I don't know if a

12   transfer is appropriate or whether instead if those

13   counts are dismissed and the Court chooses to ask for

14   briefing as to personal jurisdiction or diversity

15   jurisdiction or transfer of venue or otherwise --

16                   THE COURT:  It would come up at that

17   point you say?

18                   MR. ASMUS:  Yes.

19                   THE COURT:  All right.

20                   MR. ASMUS:  Nonetheless, we've brought

21   the 12(b)(6) because the federal question jurisdiction

22   existed and there was an allegation of supplemental

23   jurisdiction.  So I'm going to take just a couple of

24   quick minutes to talk about the three claims.

25                   THE COURT:  Right.

1              MR. ASMUS:  Unfair competition claim

2    and then two tortious interference claim, one with

3    prospective economic advantage, one with existing

4    contracts.

5              There was a comment before about how

6    there is some representative capacity issue to assert

7    California claims.  That exists for the UCL claim,

8    Your Honor.  It does not exist for the tortious

9    interference claim.  The UCL claim is a statutory claim,

10   and that's the first basis, Your Honor, for our request

11   that that claim be dismissed is because new AIPW in a

12   representative capacity cannot satisfy the statutorily

13   required elements to pursue a representative claim under

14   the UCL.  Those are set out first in Section 17203.

15             Two requirements there, one of which is

16   the representational plaintiff has to meet the standing

17   requirements of 17204.  17204 says, "Actions for relief

18   pursuant to this chapter shall be prosecuted exclusively

19   in a court of competent jurisdiction by a person who

20   has, one, suffered injury in fact; two, has lost money

21   or property as a result of the unfair competition."

22             So new AIPW in order to assert a

23   representative capacity claim itself has to be

24   statutorily injured and it has to --

25             THE COURT:  But then why is it a

1    representative claim?  That's very peculiar.  Who are

2    they representing if not some other person who's been

3    injured?

4                    MR. ASMUS:  They would need to

5    themselves be injured in addition to their members being

6    injured.

7                    THE COURT:  Oh, really?

8                    MR. ASMUS:  Uh-huh.

9                    THE COURT:  Hmm.

10                    MR. ASMUS:  17204, that's the

11    requirement.  *Quickset* is a case that we cited in our

12    brief, Your Honor, that sets out those requirements.

13    And, in fact, the briefing is conspicuous, Your Honor.

14    New AIPW concedes that it cannot satisfy those two

15    requirements in a representative capacity under 17204.

16    They ask the Court to simply apply the *Hunt* test as a

17    general constitutional standing.  But when the

18    California legislature enacted the unfair competition

19    law in its statutes, they statutorily required these

20    requirements.

21                    THE COURT:  Yes.  I guess this is

22    totally off the top of my head, but it's probably like

23    you have a bunch of people who've been injured and one

24    of them can say I'll be the one, right, to take this

25    lawsuit and I'll represent all of you in that context.

1     But it can't be an association that doesn't have its own

2     interests in this.

3                    MR. ASMUS:  So your instinct is

4     correct.  It's not one we got into because the second

5     requirement under 17203 is that you comply with

6     Section 382 of the California Code of Civil Procedure,

7     which is the pseudo class action code.  That's what it

8     is.  That's the representative capacity.

9                    So for that recent the UCL claim fails

10    as a matter of law, because new AIPW cannot meet the

11    representative standing requirements.

12                    In addition, I want to talk just very

13    briefly about the substance of the claims.  There are

14    three bases for UCL claim:  fraudulent conduct, unfair

15    conduct or unlawful conduct.  Your Honor, as we noted in

16    our reply brief, there is a concession in the brief that

17    the complaint does not sufficiently plead a fraudulent

18    conduct claim; that's been dropped.

19                    Also, importantly, there was a

20    concession in the briefs that the UCL does not provide

21    for recovery of money damages or attorneys fees.  So

22    those claims were conceded as well, which leaves us with

23    the claim that the private contractual requirement at

24    issue here is either unlawful or unfair and therefore

25    violative of the UCL.

1          What I want to say very quickly about

2     the private contractual requirement is that Your Honor

3     is correctly recognizing that the issue here is very

4     narrow.  It's a subset of secondary wholesalers who are

5     choosing to purchase drugs from either pharmacies or

6     practitioners or other secondary wholesalers that also

7     purchase from pharmacies or practitioners.  It doesn't

8     destroy the secondary market.

9          THE COURT:  I'm sorry.  So the

10    secondary market is not just the purchase from those

11    particular entities.

12         MR. ASMUS:  Correct.

13         THE COURT:  You're saying there's other

14    secondary market activity that goes on.

15         MR. ASMUS:  It's a matter of tracing

16    the source of drugs.  So if it goes through the chain

17    where it goes from manufacturer to what I'll say

18    Wholesaler No. 1 and Wholesaler No. 2 buys from

19    Wholesaler No. 1, that's a secondary market.  That's

20    permissible under the seventh criterion under the VAWD

21    requirement.

22         It's when it goes from manufacturer to

23    supplier to pharmacy or practitioner, then the secondary

24    wholesaler comes in to purchase excess stock, stock

25    that's close to being expired, and then to go resale.

1    That's what the VAWD seventh accreditation criterion is

2    intended to address.

3                    THE COURT:  All right.

4                    MR. ASMUS:  The other thing to keep in

5    mind -- and I should have said that earlier -- VAWD

6    accreditation is actually a licensure requirement for a

7    pharmacy to be licensed in three states:  North

8    Dakota, Wyoming and Indiana, it's required.  And it's

9    expressly recognized not as a licensure requirement but

10   in connection with licensure of pharmacy in 21 other

11   states.  Twenty-four of 50 states have some form of this

12   VAWD accreditation standard in their pharmacy licensing

13   scheme, again, three of which actually require it.

14                    So the argument is well, Optum's

15   decision to include in its private contracts this VAWD

16   accreditation, in order to obtain reimbursement for

17   drugs that are dispensed, you cannot purchase from a

18   non-VAWD-accredited wholesaler.  That's somehow

19   unlawful.  The adoption of it is unlawful or the impact

20   on this small segment of the secondary market is

21   unlawful.

22                    THE COURT:  I'm sorry.  You cannot

23   purchase from anyone who is not a VAWD accreditee?

24                    MR. ASMUS:  Yes.  If I didn't say that,

25   I apologize.

1            THE COURT:  That's all right.

2            MR. ASMUS:  You make my argument better

3    than I do.

4            THE COURT:  No, no.  I'm just trying to

5    keep it straight in my head.  All right.

6            MR. ASMUS:  So unlawful conduct.  In

7    other words, in order for an action to be unfair

8    competition under the statute, there has to be a

9    predicate unlawful act.  And this is not disputed.

10            And so what new AIPW says in its

11    briefing, Well, there's two predicate acts.  We have the

12    declaratory judgment claim.  That's the predicate act.

13    That's unlawful, and so that satisfies the prong.  I

14    think we've talked this morning that the alleged private

15    cause of action as against Optum under the declaratory

16    judgment is some APA claim against the government such

17    that it's not really -- you know, I think you asked

18    maybe rhetorically Why do we have the declaratory

19    judgment claim?  Don't you have your APA claim?

20            So -- but the long and short of that is

21    if the declaratory judgment claim is dismissed, then

22    that cannot be the predicate unlawful conduct to support

23    a UCL claim.

24            Likewise, the second argument is, Well,

25    we've got these two tortious interference claims as

1    well.  Those can be the predicate act as well.  First of

2    all, if those claims are dismissed for the reasons that

3    I'll get to in a minute, again, not a predicate act,

4    therefore no unlawful conduct in violation of UCL.

5                We have cited in our brief, Your Honor,

6    cases which in California interpreting the UCL, which

7    have held that a common law claim is not unlawful for

8    purposes of the UCL.  That instead, it has to be

9    statutory or a regulation or something of that nature.

10               New AIPW has cited case law to the

11   contrary, one of which is California Supreme Court case,

12   2013, *Zhang v. Superior Court*, 57 Cal. 4th 364.  And all

13   I would say about that, Your Honor, and we reported this

14   in our reply brief, that comment by the Supreme Court in

15   that particular case we believe was dicta, because the

16   *Zhang* case did not address any common law claims.  Those

17   were all statutory claims.  Therefore, predicate acts

18   for purposes of a UCL claim was properly pled.

19               So again, but -- if the declaratory

20   judgment claim and each of the two tortious interference

21   claims are dismissed, no predicate act, no unlawful

22   conduct, no UCL violation.

23               The unfair prong of the UCL claim is

24   actually incredibly complex, as I worked through the

25   briefing on this, and the initial split is whether it's

1    a consumer claim versus a nonconsumer claim.  Because

2    the unfair conduct would be different depending on what

3    circumstance existed, and we believe, of course,

4    Your Honor, that this is a nonconsumer claim.  Neither

5    new AIPW nor the members on whose behalf it's purporting

6    to bring this claim are consumers.  They are

7    nonconsumers.

8                    And so really the case law says -- and,

9    Your Honor, just for the record, that's *Cel-Tech*

10   *Communication v. Los Angeles Cellular*.  It's a 1999

11   California Supreme Court case, 20 Cal. 4th 163.  And in

12   essence, if it's a nonconsumer claim, you have to plead

13   that there is an incipient antitrust violation or that

14   the alleged unfair conduct violates the policy or spirit

15   of the antitrust claims.  And we don't have any such

16   allegations anywhere in the amended complaint.

17                    And so if this Court any chooses to

18   consider the merits of the UCL claim in the unfairness

19   prong, it should be determined to be a nonconsumer

20   claim, and the absence of an antitrust allegations in

21   the complaint means that that prong has not been

22   satisfied.

23                    THE COURT:  All right.  So why did the

24   tort claims go away?  I'm moving you off of UCL.

25                    MR. ASMUS:  Tortious interference.

113

1          THE COURT:  Yes.

2          MR. ASMUS:  Four reasons, three of

3   which are applied to both, because it's simply tortious

4   interference with perspective and existing contracts;

5   it's the same factor with the exception of one.

6               First of all, you have to have

7   plausible allegations of knowledge of the perspective or

8   actual relationship that's being interfered with by the

9   conduct.  Our position, Your Honor, is that at the time,

10  October 1, 2016, that Optum made it a private

11  contractual requirement of the VAWD accreditation.

12  There is no plausible allegation that it had knowledge

13  of the alleged perspective or existing relationships

14  between interfered with, because neither old AIPW nor

15  new AIPW had even been formed and its members had not

16  been identified.  And so there couldn't be specific

17  knowledge to implement that contractual term to harm

18  those relationships.

19          THE COURT:  All right.

20          MR. ASMUS:  It's the exact same facts

21  with respect to the second element, which is not only do

22  you have to have knowledge of the relationships, you

23  have to take action specifically to disrupt those

24  relationships.  If we didn't know about them, we

25  couldn't have acted specifically to disrupt them.  So

114

1   it's the same analysis, Your Honor, for the second

2   argument.

3               Third argument, there has to be

4   causation.  There's no plausible allegation in the

5   amended complaint regarding causation.  And, in fact,

6   what is clear from the briefing is that it's not the

7   private contractual requirement itself that is the

8   proximate cause of any alleged harm.  It's the fact that

9   the new AIPW's members either choose not to or cannot.

10              THE COURT:  They're making a decision

11  as an intervening decision that's going on.

12              MR. ASMUS:  Correct.

13              THE COURT:  All right.

14              MR. ASMUS:  What I'll say, there's

15  comments in the briefing about business models and the

16  reality of the market.  That highlights that it is not

17  the contractual requirement itself.

18              THE COURT:  Right.

19              MR. ASMUS:  It's the decision.  Fourth

20  and final, Your Honor, applies only to tortious

21  interference with the perspective relationship.  There

22  has to be an independently wrongful act; basically the

23  same analysis as the predicate acts that are needed for

24  the UCL claim.

25              There's no independently unlawful act.

1    The only thing that's alleged in the complaint is the

2    unfair prong of the UCL claim, which for reasons I've

3    stated before doesn't apply and therefore it cannot be

4    the predicate act.

5                    So we could ask that if Counts

6    I through III are dismissed, then the Court should also

7    dismiss Counts IV through VI on a 12(b)(6) basis if it

8    asserts jurisdiction over them.

9                    Thank you, Your Honor.

10                   THE COURT:  Thank you.  Mr. Levitt, let

11   me give you the final word.

12                   MR. LEVITT:  Judge, I think most of

13   these factors under the UCL, the California law and the

14   California tortious interference with contract and

15   interference with prospective economic advantage are

16   laid out in our complaint, and if the facts are taken as

17   true, we establish a claim for that --

18                   THE COURT:  All right.  Why don't you

19   talk about whether I even get there a little bit.  Their

20   initial read on this is that if -- that you have

21   asserted supplemental jurisdiction, that I have

22   supplemental jurisdiction over these claims by virtue of

23   having brought the APA and Declaratory Judgment Act

24   claims.

25                   So if those claims are dismissed, what

1    would be the basis for me to continue to exercise

2    jurisdiction over the California claims?

3                    MR. LEVITT:  You're saying if the

4    government is no longer a party to the case.

5                    THE COURT:  Yes.  Let's say the

6    government is out.  Do I go on then to venture into the

7    thicket of California law?  Do I transfer the case to a

8    California federal court to make that determination

9    about whether there is remaining jurisdiction over this

10   act, or what do we do?

11                   MR. LEVITT:  Yes, Judge.  I think that

12   we have alleged subject matter jurisdiction.  And --

13                   THE COURT:  Well, I don't have subject

14   matter jurisdiction over those claims in their own

15   right; right?

16                   MR. LEVITT:  Well --

17                   THE COURT:  Or maybe through diversity

18   is what you're saying.

19                   MR. LEVITT:  I'm not saying through

20   diversity.  I'm saying that -- we're saying that if you

21   make a new law, if Optum makes a rule that is

22   inconsistent with law, that that is, it is unfair and

23   it's to their advantage, they're taking back a hundred

24   percent of the money.  Where it goes we don't know.  But

25   they haven't said, Yeah, the money goes back to Medicare

1    because they're the principal and we're the agent.

2    They're just saying, We're taking back all the money.

3                    THE COURT:  I understand your policy

4    position.  What I'm trying to do is figure out the local

5    basis for it.  Inconsistent with federal law might give

6    you an ability to say I have subject matter jurisdiction

7    because we're talking about a federal violation.

8                    MR. LEVITT:  That's what I'm saying.

9                    THE COURT:  I'm now positing that the

10   federal claims are gone, and what you're saying is what

11   they've done is inconsistent with the California UCL and

12   California common law.  Why are we -- why am I making

13   any decision about that?

14                    MR. LEVITT:  Because we're talking

15   about the Medicare program still.  Even if the

16   government is not in the case, which I obviously think

17   that they should be, remain in the case, they're

18   obviously an agent.  They are the principal and they are

19   allowing their agent to make rules.

20                    But so the question is why are we even

21   saying that Optum's conduct is unfair?  What is it about

22   the rule that is unfair?  And what's unfair about that

23   rule is that it is inconsistent with federal law.  You

24   can get away -- if this case were transferred to state

25   or federal court in California, the judge, your

1 colleague in state or federal court in California would

2 be looking at the same federal statutes to determine

3 whether the conduct of Optum in making this rule, you

4 can't buy from pharmacies, is appropriate.

5                 THE COURT:  I'm not sure that's right.

6 I'm not sure that's right if I've already dismissed the

7 federal claims.  They're only looking at federal law

8 insofar as you've claimed a violation of federal law.

9 As I read your complaint, you do so in Counts I, II and

10 III.  Count IV, V and VI are claiming violation of

11 California law, in which case if I have dismissed Counts

12 I, II and III saying for whatever reason this Court is

13 not going to address it, you haven't stated a claim or

14 whatever, what remains in the case is the alleged

15 violation of California law.

16                 MR. LEVITT:  Judge, the California law

17 will analyze Optum's conduct.  What is Optum's conduct

18 here.  There's federal law, as I mentioned, which is a

19 Drug Supply Chain Security Act, which is all about the

20 supply of drugs.  Everything that counsel mentioned, the

21 transaction history, who you bought it from and where.

22 This is all monitored by federal law.

23                 THE COURT:  I understand, but it's the

24 claims that determine whether or not I have jurisdiction

25 over the case.  It's not just the aura of federal law

1    being violated in a general sense or that these parties

2    are operating against the backdrop of federal

3    regulation.  It's the claims that make the difference as

4    to whether or not I have jurisdiction over your

5    complaint.

6                     MR. LEVITT:  I understand, Judge.  So

7    there's no -- there's been no allegation until counsel

8    at the podium, there's no personal jurisdiction.  That's

9    the first time I'm hearing there's no personal

10   jurisdiction.

11                    THE COURT:  I think he said "I don't

12   know."  You'd have to assess it.  We'd have to brief it.

13   We'd have to focus on it.

14                    MR. LEVITT:  What I'm saying has not

15   been briefed.  This is a motion to dismiss, and it's not

16   been briefed.  And what I'm saying is even the

17   California claim is only a claim when viewed against the

18   law that relates to the drug supply, which is the

19   federal law that we mentioned, the Drug Supply Chain

20   Security Act.  The Food and Drug Cosmetic Act, the

21   Prescription Drug Marketing Act, the Prescription Drug

22   Amendments of 1992, all of those laws are inconsistent

23   with this VAWD requirement.

24                    THE COURT:  I understand.  I think I

25   understand your point.  All right.  Thank you all.  I

1    will take the motions under advisement.

2                    MR. LEVITT:  Thank you, Judge.

3                    (Proceedings adjourned at 1:00 p.m.)

4                    * * * * * * * * * * * * * * * * * * *

5            CERTIFICATE OF OFFICIAL COURT REPORTER

6

7    I, Barbara DeVico, certify that the foregoing is a

8    correct transcript from the record of proceedings in the

9    above-entitled matter.

10

11

12

13

14

15    _____              11-7-17

16    SIGNATURE OF COURT REPORTER              DATE

17

18

19

20

21

22

23

24

25